Lawrence Raymond KING, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 19624.

United States Court of Appeals
Ninth Circuit.

July 2, 1965.

Rehearing Denied Aug. 4, 1965.

Peter J. Hughes, Sheela, O'Laughlin, Hughes & Hunter, San Diego, Cal., for appellant.

Manuel L. Real, U. S. Atty., John K. Van De Kamp, Asst. U. S. Atty., Chief, Crim. Div., J. Brin Schulman, Asst. U. S. Atty., Asst. Chief, Crim. Div., Phillip W. Johnson, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before BARNES, HAMLIN and ELY, Circuit Judges.

HAMLIN, Circuit Judge.

Lawrence R. King, appellant herein, was charged in an indictment returned by the United States Grand Jury for the Southern District of California, Southern Division, in two counts: One, with smuggling approximately 500,000 amphetamine tablets, which merchandise should have been invoiced; and Two, with fraudulently and knowingly receiving and concealing approximately 500,-000 amphetamine tablets which to his knowledge had been imported into the United States contrary to law, a violation of 18 U.S.C. § 545.[1]

After a trial by jury King was convicted on both counts and given concurrent sentences thereon. The following facts were established by the evidence. At approximately 6:30 p. m. on March 6, 1964, United States Customs Agent J. D. Maxcy received information at his home at Chula Vista that appellant had gone to Tijuana, Mexico, to acquire a large quantity of amphetamine pills. The information had originally been received by a Sergeant Goodwin of the Los Angeles sheriff's office from an informant. Goodwin notified Inspector Larkworthy of the United States Food and Drug Administration, who in turn notified John Blockman, United States Customs Agent in Charge. Blockman then telephoned Agent Maxcy. The information received also disclosed that appellant would be driving one of two automobiles, which were described by model, color and license number and that appellant would cross the border "shortly after the race track or jai alai crowd broke in Mexico, which would be between 11 and 11:30 p. m." Agent Maxcy was further informed that appellant would probably make three separate trips, and that on the completion of the first trip he might "conceal or stash these pills in the Chula Vista or South bay area." At approximately 11:30 p. m. Maxcy observed a Cadillac automobile, which was one of the two cars which had been described to him, enter the United States through the port of entry. He did not stop the car at the border,[2] but followed it for about eight miles until it had passed the "E" Street cutoff in Chula Vista where Maxcy stopped it. Maxcy identified himself as a customs agent and asked

1. 18 U.S.C. § 545.

"Whoever knowingly and willfully, with intent to defraud the United States, smuggles, or clandestinely introduces into the United States any merchandise which should have been invoiced * * *; or

"Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law—"

shall be punished as provided by law·

2. "THE COURT: Mr. Maxcy, what was the reason that you did not stop the defendant at the border?

"THE WITNESS: The reason, your Honor, was that we didn't follow normal procedure and post a look-out in this instance because the information I had in my possession was that Mr. King possibly was going to contact someone else in the Chula Vista or the South Bay area immediately adjacent to the border. For this reason we maintained our own surveillance separate from the inspector for the primary purpose of following him.

"THE COURT: In other words, you didn't stop him at the border because you wanted to try to make some further arrests in the event he contacted other persons.

"THE WITNESS: That is correct; yes, sir."

King if he were bringing any contraband from Mexico. When King replied in the negative, Maxcy asked him if he minded if they looked at the vehicle and he again replied in the negative. The vehicle was then searched, and, in a specially-built compartment in the trunk, the amphetamine tablets in question were found. Prior to trial a motion to suppress this evidence was denied by the court. During this motion to suppress, appellant's counsel requested the identity of the informant. The court ruled that this was a border search and that the identity of the informant was not material to the legality of the seizure.

Appellant makes three specifications of errors: (1) The contraband evidence upon which the conviction is predicated was seized illegally by officers of the United States Government; (2) the court erred in admitting an incriminatory statement by appellant after he had been arrested; and (3) the court erred in failing to grant a short continuance in order for appellant to demonstrate the materiality of the informant's identity on the question of guilt or innocence.

To establish his first specification of error, appellant contends that there was no probable cause to search his vehicle, and that, therefore, the contraband found in that search should not have been admitted in evidence. Putting aside the fact that there was evidence that appellant consented to the search, we point out that the district court held that this was a border search. We agree. As was stated in Murgia v. United States, 285 F.2d 14 at 16 (9th Cir. 1960), "No customs search can be made precisely at the border. All must be made somewhere north of the border between Mexico and the United States." In Marsh v. United States, 344 F.2d 317 at 324 (5th Cir. 1965), the court said, "The right of border search is indeed broad, and the border itself is elastic."

In this case the Customs Agent had received information that day that appellant was in Tijuana, Mexico, for the purpose of acquiring a vast amount of amphetamine tablets, and that on the same evening appellant, driving a particularly described vehicle, would bring these tablets into the United States from Mexico, probably making three separate trips. The information was further that on completion of the first trip the tablets might be concealed in the Chula Vista or South Bay area. Agent Maxcy followed the car, keeping it in view at all times. When he saw that the vehicle had not made a turn off from the highway into Chula Vista and when it appeared that appellant might be going to Los Angeles, he then stopped the vehicle, questioned the appellant, and thereafter searched the vehicle and found the contraband.

It thus appeared from the evidence that there had been no change of condition of the auto from the time it crossed the border until it was stopped. Whatever was in the auto when it was stopped was in it when it crossed the border. We hold that where, as here, duly authorized officers receive information that a person or vehicle is about to cross the border with contraband in violation of the laws of the United States, and where shortly thereafter a person or vehicle conforming substantially to the description thereof given to such officers is seen to cross the border, and where such person or vehicle is followed therefrom by said officers and kept under surveillance until stopped and searched, and where there is no reason to believe that there is any change in condition of such person or vehicle from that at the border so that whatever such vehicle contains or such person possesses at the time the search is made is the same as it was at the border, and where no unreasonable time elapses between the border crossing and the search and there is no unreasonable distance between the border and place the search is made, such search may be held to be a border search.[3]

3. Appellant's reliance upon Cervantes v. United States, 263 F.2d 800 (9th Cir. 1959), is misplaced. In Cervantes it was pointed out that the appellant was not stopped in connection with a pursuit, but was stopped on the basis of information

This being a border search, special rules are applicable. The statutes involved are set out in the margin.[4] As we said in Witt v. United States, 287 F. 2d 389 at 391 (9th Cir. 1961):

"No question of whether there is probable cause for a search exists when the search is incidental to the crossing of an international border, for there is reason and probable cause to search every person entering the United States from a foreign country, by reason of such entry alone. That the customs authorities do *not* search every person crossing the border does not mean they have waived their right to do so, when they see fit. Here a precise description of the automobile in which appellant rode across the border (though not of its passengers) had been passed to the border guards as one being a possible bearer of heroin. This it was ultimately found to be. Mere suspicion has been held enough cause for a search at the border. Cervantes v. United States, 9 Cir., 1959, 263 F.2d 800, 803, note 5." (Emphasis original)

Similarly, in Murgia, supra 285 F.2d at 17, we said:

"The right of border search does not depend on probable cause. Carroll v. United States, 1924, 267 U.S. 132, 154, 45 S.Ct. 280, 69 L.Ed. 543. Cf.: People v. Brown, 1955, 45 Cal. 2d 640, 290 P.2d 528; Johnson v. United States, 1948, 333 U.S. 10, 16–17, 68 S.C. 367, 92 L.Ed. 436; People v. Simon, 1955, 45 Cal.2d 645, 290 P.2d 531. '[The] searches of persons entering the United States from a foreign country are in a separate category from searches generally * * * [and] "are totally different things from a search for and seizure of a man's private books and papers * * *."' King v. United States, 5 Cir., 1958, 258 F.2d 754, at page 756, certiorari denied 359 U.S. 939, 79 S.Ct. 652, 3 L.Ed.2d 639, quoting Boyd v. United States, 1886, 116 U.S. 616, 623, 6 S.Ct. 524, 29 L.Ed. 746. Cf.: Blackford v. United States, 9 Cir., 1957, 247 F.2d 745, certiorari denied 356 U.S. 914, 78 S.Ct. 672, 2 L.Ed.2d 586; United States v. Yee Ngee

that some ten weeks before the appellant, Thayer, was supposed to have gone to Tijuana to purchase narcotics, that the government official had no information that the appellant that day was transporting any contraband material, and that the appellant was stopped some seventy miles north of the border on the basis of an alert for "possible suspects."

4. 19 U.S.C. § 482 provides:
 "Any of the officers * * * authorized to board or search vessels may stop, search, and examine, as well without as within their respective districts, any vehicle * * * on which * * * he or they shall suspect there is merchandise which * * * shall have been introduced into the United States in any manner contrary to law, whether by the person in possession or charge, or by, in or upon such vehicle * * * or otherwise, * * * and if any such officer * * * so authorized shall find any merchandise on or about any such vehicle * * * which he shall have reasonable cause to believe * * * to have been unlawfully introduced into

the United States, * * * he shall seize and secure the same for trial."

19 U.S.C. § 1581 provides:
 "(a) Any officer of the custom may at any time go on board of any * * * vehicle at any place in the United States * * * without as well as within his district * * * and examine, inspect, and search the * * * vehicle and every part thereof * * * and to this end may hail and stop such * * * vehicle, and use all necessary force to compel compliance."

Subdivision (d) requires the driver of such a vehicle, upon direction of such an officer, to come to a stop, and authorizes pursuit if he does not do so.

Subdivision (e) directs seizure of the vehicle if it shall appear that a breach of the laws of the United States is being or had been committed so as to render the vehicle or the merchandise on board of, or brought into the United States by, such vehicle, liable to forfeiture.

Subdivision (f) makes it the duty of the officer to effect the seizure.

How, D.C.N.D.Cal., 1952, 105 F. Supp. 517."

See also Marsh v. United States, supra, 344 F.2d at 324, where it is said:

"Border searches are, of course, not exempt from the constitutional test of reasonableness. A true border search, however, is not regarded as unreasonable even though made without probable cause."

■ Sound policy considerations support the special treatment accorded border searches. Congress as well as the courts have thus recognized the peculiar and difficult law enforcement problems that necessarily are presented by the effective policing of our extensive national boundaries.

■■ Under the above rules we hold that the evidence upon which the conviction in this case was based was not seized illegally.

The evidence concerning appellant's second specification of error discloses that after the search of appellant's automobile, Agent Maxcy talked to appellant in the office of the Customs Agency Service at the port of entry. There, appellant was informed by Agent Maxcy that "we were going to ask him a few questions pertaining to the contraband found in his vehicle, and that it was my duty to advise him under the Constitution of the United States he was under no duty to answer any questions that we asked him, and that he was entitled to be represented by an attorney should he so desire, and that anything he did say could be used against him should we have any future court proceedings." Appellant

gave his name and occupation, disclosed that he had left his home in Long Beach about six p. m. on March 6th, that he had driven to Tijuana, Mexico, by himself, and that he had gone to the dog races there. When asked questions pertaining to the pills found in the automobile, appellant stated "he had no comment to make about the pills at that time."

■ About an hour later appellant was taken by Agent Maxcy and another agent in an automobile from the port of entry to San Diego to be booked. During this ride certain questions were asked by Agent Maxcy and certain answers given by appellant. There was also a voluntary statement made by appellant. Upon appellant's objection to the offer of this evidence, the jury was excused, and in the absence of the jury, Agent Maxcy testified as shown in the footnote.[5] After hearing appellant's counsel's objections to the offer of this testimony, the court indicated that he would not admit the two answers to the questions, but that he would admit appellant's voluntary statement. The jury was then recalled and Maxcy testified before the jury as follows:

"Q [By Mr. Johnson] Agent Maxcy, in your conversation in the vehicle with the defendant, Mr. King, was the word 'bread' mentioned?

"A Yes, sir, it was.

"Q And what was said, and by whom?

"A Mr. King stated to myself and Inspector Addis that the biggest problem was getting them home. However, once you get a taste for

5. "THE WITNESS: * * * I asked him about the compartment in the vehicle, and he said it had been a great deal of work making it, and I carried on the conversation for a period of time, and then I said, 'Gee, how were you going to get those pills out of the car?' He said, 'I was going to get them out the same way you fellows got them out.'

"I discontinued the conversation for a short period of time again, and then at

this time he stated a casual remark, 'Well, the main difficulty is getting these things home,' and, 'Once you get a taste for bread, you get yourself into a lot of trouble.'

"THE COURT: Was that last statement in response to anything that you had said?

"THE WITNESS: No, the latter one was not. The first was in response to a direct question. The latter one was not."

bread, you can get yourself in a lot of trouble." [6]

We see no error in the introduction of this evidence.

 Likewise, there is no merit in appellant's third specification of error for two reasons. First, since the district court properly held that this was a border search, probable cause for the search and demonstration of sufficient reliable information to create probable cause was not required; consequently, appellant was not necessarily entitled to knowledge of the identity of the informer. Secondly, in the course of counsel's discussion with the court concerning the production of a deputy sheriff of Los Angeles named Burman who knew the identity of the original informer, it was stipulated by both counsel that if the deputy sheriff were called he would refuse to answer questions concerning the identity of the informer or the exact details of the informer's information or activity. Then, the proceedings as set out in the footnote occurred.[7] As shown by the record, counsel was offered the opportunity of producing essential evidence and decided that he would not take advantage of that offer. We see no error in the ruling of the court.

Judgment affirmed.

6. In explanation of what the term "bread" refers to, the following testimony was given:

"THE COURT: Mr. Maxcy, what in parlance among persons who are dealing in contraband does the term 'bread' refer to?

"THE WITNESS: 'Bread' is a colloquialism, your Honor, for money. It is a slang term meaning money."

7. "THE COURT: All right.

"MR. HUGHES: And I assume that we can also stipulate that if this situation arises, that Mr. Johnson on behalf of the United States would claim the privilege to be asserted on behalf of the witness, and would back the witness up in that respect.

"THE COURT: I don't know whether I would go along with that. That is my problem.

"MR. HUGHES: Then the only alternative, and this is the only possible way we could do it otherwise, is to get him down here.

\* \* \* \* \*

"THE COURT: Again I say I don't know whether I would go along with allowing the witness not to answer certain of the questions you propounded. Nonetheless I will say that at this posture I don't believe that I would require the production of that evidence or the securing of that witness. It may be at some other posture of the case I would. So let's call the jury.

"MR. HUGHES: One minute, your Honor. We are almost through.

"THE COURT: If you want to put on any evidence to change that posture of the case, I will allow you to do so.

"MR. HUGHES: Let me state my position, your Honor, I will say that these very questions—I will move first, then, for a continuance in order to permit me to get Burman here, and, in the alternative, that the Government dismiss, or that the Court dismiss, on the ground that I have been prevented from properly preparing my defense, in that the very questions to which we have stipulated the witness would claim the privilege are material, and that will enable me to get to the point where I can demonstate to the Court the materiality of the identity of the informant.

"THE COURT: I think I have made my position clear. If you want to put on any evidence that would indicate to me that it might be necessary to require the witness to be present, I will consider it. Otherwise, the motion for a continuance is denied.

"MR. JOHNSON: At this time I would like to—

"THE COURT: Wait a minute. Mr. Hughes might have some reply there.

"MR. HUGHES: No I was only going to point out, your Honor, that I think this violates the rule, that I cannot elicit these matters during the Government's case in chief.

"THE COURT: I will allow you to present the evidence out of the presence of the jury, if you wish.

"MR. HUGHES: No, I am relying on two things here, your Honor; the Rugendorf case—

"THE COURT: Look, I have made my position clear. If you want to put on any evidence outside of the presence of the jury for the purpose of indicating that an informer might possibly assist you in the defense, I will hear that evidence. If you don't wish to, that is up to you.

"MR. HUGHES: I will rely on the state of the record, as it is, your Honor.

"THE COURT: All right. Call the jury."