**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Richard McDANIEL, Defendant-
Appellant.**

**No. 71–2810.**

United States Court of Appeals,
Fifth Circuit.

May 11, 1972.

Rehearing Denied June 15, 1972.

Donald R. Scoggins, Dallas, Tex., for defendant-appellant.

Anthony J. P. Farris, U. S. Atty., James R. Gough, Ronald J. Waska, Anthony C. Aguilar, Asst. U. S. Attys., Houston, Tex., for plaintiff-appellee.

Before WISDOM, GOLDBERG and CLARK, Circuit Judges.

GOLDBERG, *Circuit Judge:*

This is a case allegedly under the aegis of the "border search" doctrine, whose borders have never been geodetically defined and whose legal undulations are manifold. Transits and other paraphernalia, both legal and paralegal, lead to no certain perimeters. Given precedential latitude and constitutional longitude, we conclude that the search under the spotlight in this case came within the legal confines of a border search and within the constitutional confines of the Fourth Amendment.

Appellant, Richard L. McDaniel, and a companion were stopped by Border Patrol agents at 12:30 a. m. at a permanent immigration point some seven miles north of Laredo, Texas, and about eight miles from the Mexican border. The checkpoint was located along an interstate highway that leads from Laredo to San Antonio and points east. The agents had decided to stop every vehicle that night in search of aliens illegally entering. Having determined to his satisfaction that McDaniel and his companion were United States citizens, the agent requested that McDaniel open the trunk of his car. The agents testified that they were opening every trunk that night in search of aliens. The agent who talked with McDaniel also testified that the behavior of the car's occupants had aroused his suspicions; McDaniel was "nervous" and "a little bit too glib, too cooperative," while his rider was "almost frozen." When McDaniel opened the trunk the agent spotted four large burlap bags, partially covered with a Guadalajara newspaper. The contents were not discernible from the exterior of the bags. In response to the agent's question, McDaniel stated that the bags contained alfalfa. That response further aroused the agent's suspicions since, he testified, he had never seen alfalfa carried in that manner. In response to the agent's request, McDaniel opened the bags, and the agent felt and smelled what appeared to him to be marijuana. At that point the agents took McDaniel and his companion to the Border Patrol van and advised them of their *Miranda* rights. Although he stated that he understood each of his constitutional rights, McDaniel declined to sign the written waiver at the bottom of the *Miranda* form. Asked whether the substance in the trunk had been declared at the bridge, McDaniel responded that it had not, that "the marijuana had been brought across up river . . . by another party." At about 1:00 a. m. the agents took McDaniel to the Border Patrol headquarters in Laredo, where the suspected contraband in the trunk was removed. A different agent readvised McDaniel of his *Miranda* rights. McDaniel again stated that he understood those rights, but again he declined to sign the written waiver. The agent asked McDaniel if he would consider "cooperating and delivering this to the ultimate destination, wherever it was," apparently without expressly alluding to the substance as marijuana. McDaniel asked questions about how that would be accomplished, and the agents responded with a plan. McDaniel asked to discuss the proposition with his companion, and the agents left the two alone for a period of about one-half hour. McDaniel emerged and declined to continue his journey with the contents of the trunk.

McDaniel was indicted and convicted by a jury of violations of 21 U.S.C.A. § 176a, knowing introduction of marijuana into the United States. McDaniel brings this appeal by alleging that evidence was improperly and unconstitutionally admitted in two instances: (1) by an illegal search, and (2) by a failure to abide the constitutional guidelines of Miranda v. Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. We find both allegations without merit, and we affirm the verdict and judgment below.

The Fourth Amendment protects the American citizenry from "unreasonable searches and seizures," but, of course, reasonableness may vary with circumstance. United States v. Rabinowitz, 1950, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653. The border search at an international boundary is a familiar rite to many citizens. An immigration officer is authorized to search any vehicle within a "reasonable distance from any external boundary of the United States" if he has "reasonable cause to suspect" illegally-entered aliens. 8 U.S.C.A. §§ 1357, 1225; 8 C.F.R. § 287.1. A customs officer is empowered to search vehicles upon the same standard, "reasonable cause to suspect," although the customs statutes do not prescribe any distance limitations to the search. 19 U.S.C.A. §§ 482, 1581; 19 C.F.R. §§ 23.1(d), 23.11. The standards for what has been termed a "border search" have been judicially restated as "reasonable suspicion" of acts illegal under the customs or immigration statutes. See United States v. Valdez, 5 Cir. 1972, 456 F.2d 1140; United States v. Salinas, 5 Cir. 1971, 439 F.2d 376; United States v. Maggard, 5 Cir. 1971, 451 F.2d 502; see also United States v. Garcia, 5 Cir. 1971, 452 F.2d 419.

■ In substance, the term "border search" is merely a short-hand method of stating that a search is, under the circumstances, a "reasonable" stretch of the usual Fourth Amendment standard of "probable cause" because of the proximity of an international frontier and other attendant factors. The fact that one is in the process of crossing an international boundary provides sufficient reason in itself to permit a search for aliens or contraband, without the presence of any other circumstance that would normally have to attend the requirements of the Fourth Amendment:

> "Travelers may be so stopped in crossing an international boundary because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in."

Carroll v. United States, 1925, 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543, 551–552. It is settled law that the nation's perimeters are expandable for purposes of a border search, whether under the customs or the immigration authority. See King v. United States, 5 Cir. 1958, 258 F.2d 754, cert. denied, 359 U.S. 939, 79 S.Ct. 652, 3 L.Ed.2d 639; Barrera v. United States, 5 Cir. 1960, 276 F.2d 654; Marsh v. United States, 5 Cir. 1965, 344 F.2d 317; Thomas v. United States, 5 Cir. 1967, 372 F.2d 252; United States v. Hill, 5 Cir. 1970, 430 F.2d 129. It is simply unreasonable to presume that all illegally entering aliens or contraband can be apprehended along the borders themselves, and the Fourth Amendment has made reasonable accommodation to the necessity for border searches that must take place somewhat within the nation's frontiers. The Government defines a "reasonable distance" from the frontiers in which an immigration search may be effected as any point within 100 air miles of the external boundary, 8 C.F.R. § 287.1. While the customs statutes and regulations prescribe no similar geographic limitation upon the power of customs agents to conduct a "border search," the search provisions of the customs laws are, of course, subject to the constitutional tests of reasonableness. See 19 U.S.C.A. § 482; United States v. Hill, supra; Thomas v. United States, supra; Marsh v. United States, supra; United States v. Tsoi Kwan Sang, 5 Cir. 1969, 416 F.2d 306. However, proximity to the frontier does not automatically place

a 100-mile strip of citizenry within a de-constitutionalized zone, with its attendant de-escalation of Fourth Amendment requirements. We would find it peculiar, for example, if massive searches were permissible in downtown Cleveland or Buffalo on the basis of a "border search" theory. Therefore, while "border search" is a convenient phrase to describe a reasonableness standard for searches pursuant to the customs and immigration laws, it is not sufficiently internally descriptive to justify automatically the reasonableness of all searches conducted for customs and immigration purposes within a certain proximity to national borders. Once the national frontier has been crossed, the search in question must be reasonable upon *all* of its facts, only one of which is the proximity of the search to an international border. *See* United States v. Warner, 5 Cir. 1971, 441 F.2d 821; Marsh v. United States, *supra*. The following factors lead us to conclude that the search of McDaniel's car was reasonable and constitutional.

First, the checkpoint in question is reasonably situated. It is a permanent point, made permanent because the road along which it is located closely parallels the meanderings of the Rio Grande River for some five miles immediately outside Laredo. The proximity of the road to the river, as the Government pointed out in oral argument, has made that stretch of road historically amenable to alien crossings or illegal importation of contraband. The dry and fordable condition of the river at the time of the search in January added to the Border Patrol's concern with this point alongside the border. And the whole stretch of country between Laredo and San Antonio is generally desolate, spotted only by a few large towns. In order for a Border Patrol to be effective, it seems quite reasonable that some permanent points be established along isolated areas that might be or have been most easily employable for violations of the customs and immigration laws.

Second, the time of the day at which the checkpoint was operated adds an increment of reasonableness to the search in question. The agents went on duty at midnight and remained at the point until eight o'clock the next morning. While traveling in the early hours is clearly not "probable cause" for a search, it may, under certain conditions, properly arouse "reasonable suspicion." *Cf.* Spinelli v. United States, 1968, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637; Thomas v. United States, *supra*; King v. United States, 9 Cir. 1965, 348 F.2d 814, cert. denied, 1965, 382 U.S. 926, 86 S.Ct. 314, 15 L.Ed.2d 339. The nature of the stretch of road in question and the reasonable concerns of the agents regarding illegal border crossings at that point of the road would constitute sufficient attendant conditions to permit the unusual hour of travel to give rise to a reasonable suspicion. In addition, the unusual hour during which the search was operated caused a substantially lesser inconvenience and intrusion into the daily lives of innocent citizens who might simply be utilizing an interstate highway east from Laredo. *Cf.* Fernandez v. United States, 9 Cir. 1963, 321 F.2d 283.

Third, if the car can reasonably be stopped pursuant to an authorized border search, the agents are empowered to search the car, including its trunk, for aliens. *See* Ramirez v. United States, 5 Cir. 1959, 263 F.2d 385; United States v. Miranda, 9 Cir. 1970, 426 F.2d 283. But even beyond that, the objective behavior of the car's occupants, as described by the agent, would support the proposition that the agents had "reasonable suspicion" to search the trunk within the confines of the immigration statutes.

Fourth, while the Border Patrol agents did not have authority to search the contents of the bags under the immigration laws, *see* Contreras v. United States, 9 Cir. 1961, 291 F.2d 63; Roa-Rodriquez v. United States, 10 Cir. 1969, 410 F.2d 1206; United States v. Hortze,

S.D.Cal.1959, 179 F.Supp. 913, they were empowered under the circumstances to search the bags under the authority of the customs laws. It appears that Border Patrol agents wear two hats, one as an immigration officer and the other as a customs officer. The agents testified that they had planned to wear their immigration hats that night, but we find nothing in the statutes that would preclude them from later donning their customs hats during a proper border search. *See* United States v. Bird, 5 Cir. 1972, 456 F.2d 1023; United States v. Maggard, *supra.* However, since they are operating on an "expanded border search" theory in this instance, the agents must have adequate grounds for a "reasonable suspicion" that the bags contained a substance being transported in violation of the customs laws, 19 U.S.C.A. § 482.[1] The Guadalajara newspaper was in open view inside the trunk, as were the four bags. *See* Coolidge v. New Hampshire, 1971, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564; Haerr v. United States, 5 Cir. 1957, 240 F.2d 533. In addition, McDaniel's explanation that the bags contained alfalfa did not comport with the agent's own general knowledge concerning the methods of transporting that grain. Taken in conjunction with the previously discussed behavior of both occupants, these circumstances amount to a very reasonable suspicion that contraband was in the bags.

■ In sum, we conclude that, under all of the circumstances involved here, the search of the vehicle was reasonable under the customs and immigration statutes and within the otherwise stricter confines of the Fourth Amendment. Once the bags had been opened and the agent had seen, felt, and smelled the contents, he had "reasonable cause to believe" that the contents were subject to duty. 19 U.S.C.A. § 482, *supra* note 1.

Much of the *Miranda* case, like the "border search" doctrine, turns on the reasonableness of the circumstances. It is the purpose of *Miranda* to lend some assurance to the judiciary that each potential criminal defendant knows his constitutional rights. Without *Miranda* a court would have a very difficult task of ascertaining the constitutionality of statements rendered while in custody under a number of cases. *E. g.,* Escobedo v. Illinois, 1964, 378 U.S. 478, 84 S. Ct. 1758, 12 L.Ed.2d 977; Malloy v. Hogan, 1964, 378 U.S. 1, 84 S.Ct. 1489, 12 L. Ed.2d 653; Murphy v. Waterfront Commission, 1964, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678; Carnley v. Cochran, 1962, 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70; Gideon v. Wainwright, 1963, 372 U.S. 335, 83 S.Ct. 792, 9 L. Ed.2d 799; Douglas v. California, 1963, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811. Even with *Miranda's* prescribed warnings, the certainty with which a court might determine that statements were made with full knowledge of rights and privileges under the Fifth and Fourteenth Amendments is often unclear. In this case the *Miranda* warnings were twice properly given and at the proper times, once at the Border Patrol checkpoint and again at Border Patrol headquarters in Laredo. At both

1. "Any of the officers or persons authorized to board or search vessels may stop, search, and examine, as well without as within their respective districts, any vehicle, beast, or person, on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law, whether by the person in possession or charge, or by, in, or upon such vehicle or beast, or otherwise, and to search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law; and if any such officer or other person so authorized shall find any merchandise on or about any such vehicle, beast, or person, or in any such trunk or envelope, which he shall have reasonable cause to believe is subject to duty, or to have been unlawfully introduced into the United States, whether by the person in possession or charge, or by, or upon such vehicle, beast, or otherwise, he shall seize and secure the same for trial." 19 U.S.C.A. § 482.

stations McDaniel was asked if he understood his rights, and he replied in the affirmative. However, at both stations McDaniel was also asked to sign a written waiver of the constitutional rights outlined in *Miranda*; McDaniel asked the questioning agent whether or not he was required to sign the waiver, and on both occasions was answered in the negative. Yet on both occasions conversation between the agents and McDaniel continued, with the result that incriminating testimony was admitted tending to show McDaniel's knowledge that the substance in his trunk was really marijuana and not alfalfa.

The first agent at the checkpoint, having read the *Miranda* warnings and ascertained that McDaniel understood them, asked whether the substance in the trunk had been declared at the bridge, although he did not specifically refer to the substance as marijuana. McDaniel responded that "he had not [declared it]," and then proceeded to volunteer that "the marijuana had been brought across up river. He did not know exactly where, but by another party." The agent at the Laredo headquarters, after the warnings were given and the waiver refused, asked McDaniel if he would consider "cooperating and delivering this to the ultimate destination, wherever it was," again apparently without alluding to the contents of the trunk as marijuana. McDaniel asked questions about the mechanics of that cooperation, and the agents proffered a plan. McDaniel asked to discuss the proposition alone with his rider, and the agents agreed. McDaniel emerged half an hour later and refused to continue his journey with the trunk's contents. These two actions by McDaniel were certainly probative of his knowledge that the substance in the trunk was really marijuana, a crucial element for conviction under the statute. There was other evidence in the record to support a jury finding that McDaniel knew the nature of his cargo, but these statements are so prejudicial that, if improperly elicited, they would require reversal.

We conclude, as did the district court, that McDaniel heard and understood his constitutional rights, and that the statements in question were voluntarily made. The *Miranda* warnings were read at two different times by two different agents. Each agent testified that McDaniel was asked specifically if he understood the rights and that McDaniel responded in the affirmative. McDaniel's incriminating statements were not made in response to any questions by the agents that solicited any information regarding the contents of the trunk. McDaniel is left with the proposition that his refusal to sign the waiver is, ipso facto, grounds for excluding any conversation subsequent to the proffer and refusal of the written waiver. That, however, is not the law of this court:

> "[T]he mere refusal to sign a waiver does not automatically render inadmissible all further statements of the defendant."

United States v. Phelps, 5 Cir. 1971, 443 F.2d 246, 248. *See also* United States v. Hopkins, 5 Cir. 1970, 433 F.2d 1041, cert. denied, 401 U.S. 1013, 91 S.Ct. 1252, 28 L.Ed.2d 550; Hodge v. United States, 5 Cir. 1968, 392 F.2d 552; *accord* United States v. Thompson, 4 Cir. 1969, 417 F.2d 196, cert. denied, 1970, 396 U.S. 1047, 90 S.Ct. 699, 24 L.Ed.2d 692. A refusal to sign a waiver may indicate nothing more than a reluctance to put pen to paper under the circumstance of custody. A detainee may still wish to discuss the matter with his detainers for any number of reasons, including a desire to exculpate or explain himself. Put another way, a detainee may make statements that are quite voluntary without signing a written waiver. A court must look to all the circumstances of the detention to ascertain whether or not the refusal to sign a waiver was tantamount to a refusal to discuss. *See* United States v. Johnson and Young, 5 Cir. 1972, 455 F.2d 311; *see also* United States v. Thompson, *supra*; United States v. Hayes, 4 Cir. 1967, 385 F.2d 375, cert. denied, 1968, 390 U.S. 1006, 88

S.Ct. 1250, 20 L.Ed.2d 106. If the detainee affirmatively indicates a desire to end the conversation, then conversation must cease. Miranda v. Arizona, *supra*. But the detainee may also affirmatively indicate a willingness to maintain the conversation, and it appears to us that McDaniel so indicated. The first agent's only question to McDaniel after the initial stop and search at the checkpoint related simply to whether or not the substance in the trunk had been declared at the border. It was McDaniel, apparently in an effort to exculpate himself from suspicion of crossing the border, who volunteered that the substance was marijuana. Under the circumstances, that statement appears to us to have been entirely voluntary and to have been made with full knowledge of individual rights. The second agent's conversation with McDaniel in Laredo's Border Patrol headquarters related to the possibility that McDaniel might continue his journey with the contents of the trunk. It was McDaniel who requested more information regarding that proposition and more time to discuss it with his compatriot. Again, it was McDaniel who introduced the marijuana element into the conversation. And again, we must conclude that McDaniel voluntarily mulled over the proposition in an effort to assuage a difficult situation, and that his statements in conjunction with that mulling are likewise voluntary. *See* United States v. Phelps, *supra,* and United States v. Ramos, 5 Cir. 1971, 448 F.2d 398, where officers persisted in their direct questioning of the detainees regarding the specific elements of the suspected crimes, despite the manifest reluctance of the detainees in those cases to maintain any conversation with the agents, which included the refusal to sign written waivers. McDaniel was read his *Miranda* warnings twice and stated both times that he understood them. Nevertheless, he volunteered unsolicited information that the contents of the trunk was marijuana, and he solicited and considered information regarding a cooperative scheme to deliver the trunk's contents. Under these circumstances, McDaniel's incriminating statements appear to be vountary, and we cannot say that *Miranda* has been violated:

> "When all the circumstances indicate that the defendant knew of his right to remain silent and intelligently waived that right, the refusal to sign a written waiver does not render a confession inadmissible."

United States v. Johnson and Young, *supra* at 314 of 455 F.2d.

Although McDaniel's conviction treads perilously close in some respects to the borders of both the Fourth Amendment and the Fifth Amendment-*cum-Miranda,* we conclude that the search and the statements in question here managed to remain inside that sometimes uncertain but always potent constitutional line which encircles the Government's relationships to its individual citizens. This balancing act is therefore affirmed.

Affirmed.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.