# Authority of Foreign Law Enforcement Agents to Carry Weapons in the United States

No federal statutes generally authorize foreign law enforcement agents to carry firearms in the United States. In particular, 18 U.S.C. § 951 does not provide such authority.

Absent congressional consent, the Emoluments Clause precludes foreign agents from enforcing federal laws. 19 U.S.C. § 1401(i) does not constitute such consent.

The President does not possess inherent authority to designate foreign agents to carry firearms in the United States in order to enforce federal law.

April 12, 1988

MEMORANDUM OPINION FOR THE DEPUTY ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

This memorandum is in response to your request for our opinion as to the existence of any basis in federal law for a United States law enforcement agency to authorize foreign law enforcement agents to carry firearms within the United States. You also requested that we consider 18 U.S.C. § 951 and 19 U.S.C. § 1401(i) in connection with this issue. 18 U.S.C. § 951 requires those who act as agents of foreign governments to notify the Attorney General; 19 U.S.C. § 1401(i) authorizes the Treasury to designate persons as customs agents, who may then as customs agents carry firearms to enforce the customs laws. First, to our knowledge, no statute generally authorizes foreign law enforcement agents ("foreign agents") to carry firearms in the United States. In particular, 18 U.S.C. § 951 clearly does not provide such authority, because it simply requires those who act as agents of a foreign government to notify the Attorney General. Second, in the absence of the consent of Congress, the Emoluments Clause of the United States Constitution precludes foreign agents from exercising authority to enforce federal law. 19 U.S.C. § 1401(i), which authorizes the Secretary of the Treasury to designate individuals to enforce the customs laws, and thus to carry weapons, does not constitute such consent. Finally, the President does not possess inherent authority to designate foreign agents to carry firearms in order to enforce federal law.[1]

---

[1] We do not address the authority of foreign agents to possess firearms under state law. We are aware of no federal law that would prevent the states from authorizing the carrying of firearms by foreign agents. We also have not addressed the rights or obligations of the United States in connection with any treaties to which it is a party. This memorandum also does not consider the sharing of law enforcement information, or similar forms of cooperation, between United States and foreign law enforcement officials, and the conclusions set forth herein do not preclude such cooperation. As our analysis reveals, assuming that foreign agents are not designated as United States officers and do not exercise law enforcement powers on behalf of the United States, cooperation would not by itself render a foreign law enforcement agent an officer of the United States and thus subject to the Emoluments Clause.

**Analysis**

*I. Federal Statutes Authorizing Foreign Agents to Carry Firearms*

To our knowledge no law authorizes foreign agents to carry firearms. In particular, 18 U.S.C. § 951 does not represent such authorization. Section 951 merely requires that persons who act as agents of a foreign government notify the Attorney General. Section 951(b) authorizes the Attorney General to promulgate "rules and regulations establishing requirements for notification." Nothing in the text or legislative history of the statute suggests that it provides a basis in federal law for the Attorney General to permit foreign agents to carry firearms.

*II. Federal Statutes Authorizing Designated Persons to Enforce Federal Law*

It has also been suggested that other statutes, such as 19 U.S.C. § 1401(i), that permit the federal government to designate persons to enforce federal laws, may authorize foreign agents designated under these statutes to carry firearms. Because we believe that the Emoluments Clause precludes the designation of foreign agents to enforce federal law in the absence of congressional consent, we do not believe that section 1401(i), or any other statute that we have examined, can be used to authorize foreign agents to carry firearms.

The Emoluments Clause prohibits federal officers from receiving a variety of benefits from foreign governments in the absence of the consent of Congress. The Clause provides in part:

> [N]o Person holding any Office of Profit or Trust under them [the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

U.S. Const. art. I, § 9, cl. 8. This clause, adopted unanimously at the Constitutional Convention of 1787, was intended by the Framers to preserve the independence of officers of the United States from corruption and foreign influence.[2]

The Emoluments Clause must be read broadly in order to fulfill that purpose. Accordingly, the Clause applies to all persons holding an office of profit or trust under the United States, and not merely to that smaller group of persons who are deemed to be "officers of the United States" for purposes of Article II, Section 2 of the Constitution.[3] Thus, a part-time staff consultant to the Nuclear Regulatory

---

[2] 3 *The Records of the Federal Convention of 1787*, at 327 (Max Farrand ed., 1966).

[3] Letter for James A. Fitzgerald, Assistant General Counsel, United States Nuclear Regulatory Commission, from Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel at 3–5 (June 3, 1986) ("Fitzgerald letter").

Commission, an assistant director of a division within the National Archives, and a postal clerk have all been recognized as occupying an "office of profit or trust" for purposes of the Emoluments Clause.[4] As a matter of general principle, anyone exercising law enforcement powers on behalf of the United States must be viewed as holding an office of trust under the Emoluments Clause. Federal law enforcement agents, by the nature of their office, are frequently granted an array of powers that are denied to the private citizen; in turn, citizens look to such officers to perform a host of dangerous but necessary tasks to the best of their ability and with undivided loyalty to the United States.[5]

These same characteristics of office—the reposing of trust, the importance of the task performed by those who hold the office, the necessity for undivided loyalty—have been cited in other contexts in support of a determination that an office is an "office of profit or trust" under the United States for purposes of the Emoluments Clause.[6] Moreover, as the text of the Emoluments Clause suggests, one can hold an "office of trust" for purposes of the Emoluments Clause even if the office entails no compensation. 15 Op. Att'y Gen. 187, 188 (1877) (members of Centennial Commission who receive no compensation may nonetheless hold "offices of trust" under the Emoluments Clause). Accordingly, those who possess federal law enforcement powers, whether paid or unpaid, hold offices of trust under the United States. It is equally clear that foreign law enforcement agents are in the position of receiving or expecting to receive "emoluments" from their own governments: salary and pension benefits, among many other potential "emoluments." At a minimum, it is well established that compensation for services performed for a foreign government constitutes an "emolument" for purposes of the Emoluments Clause.[7]

Therefore, any foreign agent authorized by the federal government to enforce federal law would hold an office of trust under the United States, while at the

---

[4] Fitzgerald letter; *Applicability of Emoluments Clause to Proposed Service of Government Employee on Commission of International Historians*, 11 Op. O.L.C. 89 (1987); 27 Op. Att'y Gen. 219 (1909)

[5] *See also Foley v. Connelie*, 435 U.S 291, 299–300 (1978)

[6] *E.g.*, Fitzgerald letter at 5

[7] Fitzgerald letter at 2 n.2.

To the extent that a Memorandum from Robert G. Dixon, Jr., Assistant Attorney General, to Dudley H. Chapman, Associate Counsel to the President, May 10, 1974, suggests at page 4 that the appointment of a foreign official to an office of profit or trust under the United States may raise only a limited concern under the Emoluments Clause because "the fact of foreign service would be known to the appointing official and could therefore be evaluated in connection with the duties required by the contemplated appointment," we disagree As an initial matter, we find no support in the words of the Constitution for any such limited concern The Emoluments Clause by its terms erects a prohibition against the receipt of benefits from foreign governments: that prohibition may only be avoided with the consent of Congress. There is no further provision that the Emoluments Clause does not apply to foreign officials who are offered offices of profit or trust under the United States, or when the receipt of the foreign emolument is known beforehand The sole test is, again, whether Congress has consented or not.

Moreover, even were some argument to be made that in this case a foreign agent can be deemed to have "accepted" his foreign emolument prior to becoming an officer of the United States, and thus should escape the prohibition of the Emoluments Clause, it would nonetheless be clear that such an agent would be in a position of expecting to receive future "emoluments" from a foreign government. The express terms of the Emoluments Clause clearly would apply to such a situation, and equally clearly would forbid the creation of such divided loyalties.

69

same time receiving emoluments from a foreign government. The divided loyalty thus produced by such an authorization is prohibited by the Emoluments Clause, absent the consent of Congress.[8] None of the statutes that we have reviewed constitutes such consent.

As described in your memorandum, it is evidently the practice of the Customs Service to designate foreign law enforcement officers as customs agents, under 19 U.S.C. § 1401(i), thereby permitting them—as customs agents—to carry firearms in the United States.[9] Assuming that the Customs Service is observing the requirements of 19 U.S.C. § 1401(i) that the Secretary of the Treasury (or his delegate) make such a designation, its use of section 1401 to designate individuals who are not beholden to foreign governments as customs agents would be lawful. Section 1401(i) has been upheld repeatedly as a basis for designating border patrol officers as customs agents, thereby extending to the border patrol the broader search and seizure powers of customs agents. *E.g., United States v. McDaniel*, 463 F.2d 129, 130 (5th Cir. 1972), *cert. denied*, 413 U.S. 919 (1973); *United States v. Thompson*, 475 F.2d 1359, 1362–63 (5th Cir. 1973).

Extending section 1401 to the designation of foreign agents, however, would violate the Emoluments Clause. The designated foreign agents would become customs agents of the United States, yet customs agents occupy positions of trust to which special powers have been granted and which require undivided loyalty to the United States. Customs agents, therefore, including designated customs agents, hold "offices of profit or trust" within the meaning of the Emoluments Clause. A foreign agent designated as a United States customs agent, however, would simultaneously be expecting "emoluments"—for example, his pay—from a foreign government.[10] Accordingly, designating a foreign agent who expects pay from his foreign government as a United States customs agent runs afoul of the Emoluments Clause.

Moreover, section 1401 by itself cannot be held to constitute the consent of Congress necessary to exempt foreign agents from the Emoluments Clause prohibition. As noted above, section 1401(i) occurs in a list of statutory definitions, and simply provides that "any . . . other person" may be designated as a customs agent. The statute does not specifically address the designation of foreign law enforcement agents as customs agents. When Congress has granted its consent to the receipt of foreign emoluments by federal officers, it has done so explicitly. Thus, the Foreign Gifts Act provides in so many words that "Congress consents" to federal employees accepting gifts "of minimal value," tendered by a foreign government as a "mark of courtesy." 5 U.S.C. § 7342(c). Similarly, 5 U.S.C.

---

[8] Fitzgerald letter at 6–7.

[9] Section 1401(i), which appears in a list of statutory definitions, provides:

The terms "officer of the customs" and "customs officer" mean any officer of the United States Customs Service of the Treasury Department (also hereinafter referred to as the "Customs Service") or any commissioned, warrant, or petty officer of the Coast Guard, or any agent or other person authorized by law or designated by the Secretary of the Treasury to perform any duties of an officer of the Customs Service.

[10] See text accompanying note 7, *supra*

§ 7342(d) provides that "Congress consents" to federal employees accepting decorations offered by foreign governments. While the consent of Congress may be expressed without invoking the words "Congress consents," a statute must demonstrate through its text or purpose that Congress intended to consent to the holding of specific offices by those receiving foreign emoluments. Only through such an affirmative legislative decision may the Constitution's requirement of consent be satisfied. There is, however, no such indication of consent reflected in the text or purpose of section 1401(i).[11] Another statute which, on its face, is similar to section 1401(i) is 28 U.S.C. § 533. That statute provides that the Attorney General may appoint officials "to conduct such other investigations regarding official matters under the control of the Department of Justice and the Department of State as may be directed by the Attorney General." The accompanying Historical and Revision Notes state that such officials are to have "the authority necessary to perform their duties." The argument could be made that the Attorney General could appoint a foreign agent to serve as a federal investigative official under this statute, and that if it is necessary for such an official to carry firearms in order to perform his duties, he would be accordingly empowered to do so. Similarly, 18 U.S.C. § 3053, which grants to U.S. Marshals and their deputies the power to carry firearms, could be seen as a vehicle for deputizing foreign law enforcement agents. For the reasons stated above, however, the Emoluments Clause would appear to preclude the use of these statutes to appoint a foreign agent as a federal "investigative official," or as a deputy U.S. Marshal. Neither statute contains or reflects the consent of Congress necessary to avoid the Emoluments Clause.

*III. Application of the Emoluments Clause to the President's Inherent Authority*

The President does not have inherent authority to authorize foreign law enforcement officers to carry firearms in the United States. As set forth below, any attempt to invoke the President's inherent authority to designate agents to enforce federal law would pose the same Emoluments Clause problem discussed above. Because Congress would have to consent to such a designation, the President has no authority to make such designations without Congress' consent. The President has broad inherent authority to enforce federal law under the Constitution. That inherent authority is based upon the President's position as chief executive, his responsibility for the conduct of foreign affairs, and his obligation to "take Care that the Laws be faithfully executed." U.S. Const. art. II, §§ 1, 2 and 3; *In re Debs*, 158 U.S. 564, 581–82 (1895); *In re Neagle*, 135 U.S. 1, 63–68 (1890); Memorandum for Robert E. Jordan III, General Counsel of the Depart-

---

[11] Moreover, had Congress intended to consent to the designation of foreign agents as armed custom agents, it would presumably also have addressed the number of other statutory problems that such a designation would present. Such problems may include the requirement under 5 U.S.C. § 3331 that appointees to the civil service take an oath of loyalty to the United States.

71

ment of the Army, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Authority to Use Troops to Protect Federal Functions, including The Safeguarding of Foreign Embassies in the United States* at 1–2 (May 11, 1970) (inherent authority provides basis for using federal troops to protect foreign embassies); Memorandum for Wayne B. Colburn, Director, United States Marshals Service, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Law Enforcement Authority of Special Deputies Assigned to DOT to Guard Against Air Piracy* at 1–3 (Sept. 30, 1970) (inherent authority may be invoked to appoint sky Marshals with enforcement powers). The President's inherent authority, however, is of course circumscribed by the specific provisions of the Constitution. *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936). As discussed above, foreign agents enlisted to help enforce the laws of the United States will be exercising federal law enforcement authority within the United States, regardless of what title they carry; their federal function alone will suffice to make them officers of the United States for purposes of the Emoluments Clause. Because Congress must consent to the holding of office by foreign agents, the President does not have the inherent authority to designate foreign agents to enforce federal law.

## Conclusion

For the reasons stated, we do not believe that any federal law to which you have directed our attention authorizes foreign agents to carry firearms. Nor does the President have inherent authority to authorize foreign agents to carry firearms in order to execute federal law.

JOHN O. MCGINNIS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*