Kenneth R. MARSH and Marion W. Martinez, Appellants,

v.

UNITED STATES of America, Appellee.

No. 21124.

United States Court of Appeals Fifth Circuit.

March 25, 1965.

Clyde W. Woody, Houston, Tex., for appellants.

Morton L. Susman, James R. Gough, Asst. U. S. Attys., Woodrow Seals, U. S. Atty., Thomas L. Morrill, Asst. U. S. Atty., Houston, Tex., for appellee.

Before RIVES and BROWN, Circuit Judges, and NOEL, District Judge.

RIVES, Circuit Judge:

Marsh and Martinez were convicted under a one-count indictment which charged in part:

"That within the five years last past, in the Laredo Division of the Southern District of Texas, and elsewhere, within the jurisdiction of this Court, one KENNETH R. MARSH, and one MARION W. MARTINEZ, also known as 'Tony,' both being herein indicted, and one John Taylor Malone, not herein indicted, hereinafter sometimes called the conspirators, did unlawfully, wilfully, and knowingly combine, conspire, confederate, and agree together, with one another, and each with the other, and with other persons to the Grand Jurors unknown, to commit the following *and other* offenses against the laws of the United States:

"To knowingly conceal and facilitate the transportation and concealment of heroin hydrochloride after it had been brought into the United States contrary to law, knowing the same to have been brought into the United

States contrary to law, in violation of Section 174, Title 21, United States Code.

"The said conspiracy was in process of operation and in execution from on and prior to March 25, 1963, to on or about April 20, 1963, and was substantially as follows:

"From time to time, one or more of the conspirators would acquire quantities of heroin hydrochloride in the Republic of Mexico; one or more of the conspirators would then smuggle and bring into the United States such heroin hydrochloride; one or more of the conspirators would then conceal, transport and facilitate the transportation and concealment of such heroin hydrochloride to various places within the United States.

"Pursuant to the said unlawful combination, confederation and conspiracy, the following *and other* overt acts were committed: [Eight overt acts were listed.]" (Emphasis supplied.)

Marsh was sentenced to eight years' imprisonment and Martinez to thirteen years'. Their contentions on appeal focus on two rulings of the district court: 1, in striking from the indictment the words "and other" emphasized in the part just quoted where those words appeared before "offenses" and also before "overt acts"; and 2, in admitting evidence obtained by an arrest and search of the defendants claimed to be illegal.

### Striking Words from The Indictment.

On August 30, 1963, a month and a half before trial, the defendants' attorney called to the attention of the court his motion for a bill of particulars describing the "other offenses" and the "other overt acts" alleged in the indictment. The court stated, "I should be inclined simply to strike out 'and other' offenses," and said to defendants' attorney:

"And I suspect that if you and Mr. Morrill [the Asst. U. S. Attorney]

will sit down and talk about this, you can work it out, and that I can perhaps correct it by an agreed amendment to the indictment. I think we can make minor changes that don't change the substance of it without resubmitting it, particularly if there is no subjection (sic)."

On September 6, 1963, some ten or more days before the trial began, the following colloquy occurred between court and counsel:

"THE COURT: Now, one more thing, Mr. Woody [defendants' attorney], in connection with the indictment. In one of the paragraphs of your motion, you complain of the fact that the indictment charges that the defendants conspired 'to commit the following and other offenses against the laws of the United States'—I am reading from lines 10 and 11 on the first page—and make the [22] point that other statutes, that is, statutes other than Section 174 of Title 21 may be referred to.

"I am inclined to the view that that's well taken, and I am inclined just to strike out the words 'and other.' That is agreeable with you, and will meet that point, will it not?

"MR. MORRILL: Your Honor, we are relying only on Title 21, Section 174, and we were planning to voluntarily supply particulars to that effect.

"THE COURT: Well, suppose I just strike out 'and other,' and there will be no need.

"MR. MORRILL: Yes, sir.

"THE COURT: Let's see: And I think the same thing is essentially true on the next page. Line 9, you set (sic), 'and other overt acts,' where you apparently refer to—you enumerate some eight and then say 'and others.'

"MR. MORRILL: We may have other overt acts in the proof, Your Honor.

"THE COURT: You can prove them, but you have to prove one you allege, do you not?

"MR. MORRILL: Yes, sir.

\* \* \* \* \* \*

"THE COURT: Hence, how does it help matters any to have 'and other overt acts' in there?

"MR. MORRILL: I agree with the Court, it doesn't help anything, but I don't believe it is prejudicial, either.

"THE COURT: I believe I will strike it out. Is that agreeable to you, Mr. Woody?

"MR. WOODY: Yes, Your Honor, it is."

Thereafter those words were considered as stricken and the court denied the defendants' motion for bill of particulars. It is not denied that striking the words "and other" obviated any need for a bill of particulars. The contention is that, even with the consent of the United States and of defendants' attorney, the court cannot legally so amend the indictment.

■ Rule 7(b), Fed.R.Crim.P., imposes the safeguards that, for a defendant to waive prosecution by indictment, he must do so "in open court," and "after he has been advised of the nature of the charge and of his rights." [1] Except as permitted by that rule, it is clear that one cannot be tried for an infamous crime unless on indictment. See U.S. Const. amend. V. Nothing can be added to an indictment, and its charges cannot be broadened even by consent. As said in United States v. Norris, 1930, 281 U. S. 619, 622, 50 S.Ct. 424, 425, 74 L.Ed. 1076:

"If the stipulation be regarded as adding particulars to the indictment, it must fall before the rule that nothing can be added to an indictment without the concurrence of the grand jury by which the bill was found. Ex parte Bain, 121 U.S. 1 [7 S.Ct. 781, 30 L.Ed. 849]."

The rule was accurately stated in Stirone v. United States, 1960, 361 U.S. 212, 215–217, 80 S.Ct. 270, 272–273, 4 L.Ed. 2d 252.

"Ever since Ex parte Bain, 121 U.S. 1 [7 S.Ct. 781, 30 L.Ed. 849], was decided in 1887, it has been the rule that after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself. In that case, the court ordered that some specific and relevant allegations the grand jury had charged be stricken from the indictment so that Bain might be convicted without proof of those particular allegations.[2]

"2. Bain was indicted for making a false statement 'with intent to deceive *the Comptroller of the Currency and* the agent appointed to examine the affairs of said association \* \* \*.' After sustaining demurrers of Bain to the indictment, the trial court went on to say that 'thereupon, on motion of the United States, by counsel, the court orders that the indictment be amended by striking out the words "*the Comptroller of the Currency and*" therein contained.' By this amendment it was intended to permit conviction of Bain without proof that he had deceived the Comptroller as the grand jury had charged."

\* \* \* \* \* \*

"The Bain case, which has never been disapproved, stands for the rule that a court cannot permit a defendant to be tried on charges that are not made in the indictment against him. See also United States v. Norris, 281 U.S. 619, 622 [50 S.Ct. 424, 74 L.Ed. 1076]; Cf. Clyatt v. United States, 197 U.S. 207, 219, 220 [25 S.Ct. 429, 49 L.Ed. 726]."

Another clear statement of the rule is contained in the dissenting opinion of Chief Justice Stone in United States v.

1. Form 18 of the Appendix to Rule 58, Fed.R.Crim.P., provides for both the defendant and his counsel to sign a written waiver.

Ballard, 1944, 322 U.S. 78, 90, 91, 64 S. Ct. 882, 888, 88 L.Ed. 1148:

. "An indictment is amended when it is so altered as to charge a different offense from that found by the grand jury. Ex parte Bain, 121 U. S. 1 [7 S.Ct. 781, 30 L.Ed. 849]. But here there was no alteration of the indictment, Salinger v. United States, 272 U.S. 542, 549 [47 S.Ct. 173, 71 L.Ed. 398], nor did the court's action, in effect, add anything to it by submitting to the jury matters which it did not charge. United States v. Norris, 281 U.S. 619, 622 [50 S.Ct. 424, 74 L.Ed. 1076]. In Salinger v. United States, supra, 548–9 [47 S.Ct. p. 175], we explicitly held that where an indictment charges several offenses, or the commission of one offense in several ways, the withdrawal from the jury's consideration of one offense or one alleged method of committing it does not constitute a forbidden amendment of the indictment. See also Goto v. Lane, 265 U.S. 393, 402–403 [44 S.Ct. 525, 68 L.Ed. 1070]; Ford v. United States, 273 U.S. 593, 602 [47 S.Ct. 531, 71 L.Ed. 793]. Were the rule otherwise the common practice of withdrawing from the jury's consideration one count of an indictment while submitting others for its verdict, sustained in Dealy v. United States, 152 U.S. 539, 542 [14 S.Ct. 680, 38 L.Ed. 545], would be a fatal error."

Nowhere has the principle been more clearly stated than by Chief Judge Lumbard of the Second Circuit, sitting by designation on this Circuit:

"It is clear that an indictment may not be amended except by resubmission to the grand jury. Russell v. United States, 369 U.S. 749, 770, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); Ex parte Bain, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887). But the Supreme Court has held that withdrawing a part of a charge from the consideration of the jury does not work an amendment of the indictment, Salinger v. United States, 272 U.S. 542, 548–549, 47 S.Ct. 173, 71 L.Ed. 398 (1926), provided nothing is thereby added to the indictment. See United States v. Norris, 281 U.S. 619, 622, 50 S.Ct. 424, 74 L.Ed. 1076 (1930); United States v. Ballard, 322 U.S. 78, 88, 90–91, 64 S.Ct. 882, 88 L.Ed. 1148 (1944) (Stone, C. J., dissenting). The 'severance' which occurred in this case was not an amendment which added any charges to the indictment and was therefore proper."

Overstreet v. United States, 5 Cir. 1963, 321 F.2d 459, 461; cert. denied, Feb. 17, 1964, 376 U.S. 919, 84 S.Ct. 675, 11 L. Ed.2d 614. See also Williams v. United States, 5 Cir. 1950, 179 F.2d 656, 659, aff'd without discussing this question, 1951, 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774.

The defendants rely, however, on the most recent expression of the Supreme Court in Russell v. United States, 1962, 369 U.S. 749, 770, 82 S.Ct. 1038, 1050, 8 L.Ed.2d 240:

"This underlying principle is reflected by the settled rule in the federal courts that an indictment may not be amended except by resubmission to the grand jury, unless the change is merely a matter of form. Ex parte Bain, 121 U.S. 1 [7 S.Ct. 781, 30 L.Ed. 849]; United States v. Norris, 281 U.S. 619 [50 S.Ct. 424, 74 L.Ed. 1076]; Stirone v. United States, 361 U.S. 212 [80 S. Ct. 270, 4 L.Ed.2d 252]."

In that case the petitioners were convicted of violating 2 U.S.C. § 192, which makes it a misdemeanor for any person summoned to testify before a committee of Congress to refuse to answer "any question pertinent to the question under inquiry." The judgments of conviction were reversed by the Supreme Court because the indictments failed to identify the subject under subcommittee inquiry when the witnesses were inter-

rogated. The expression which has been quoted was used in ruling that the deficiency in the indictment could not have been cured by bill of particulars.

█ In the present case, if, instead of striking the words "and other," the amendment had added those words so as to increase the number of offenses charged, clearly the amendment would be prejudicial to the defendants and not "merely a matter of form." The reverse does not, however, hold true. The possible amendment held to be not "merely a matter of form" in Russell v. United States, supra, was an addition of a statement of the question under congressional committee inquiry.

Rule 7(d) of the Federal Rules of Criminal Procedure permits the court on motion of the defendant to strike surplusage from the indictment. In substance that is what occurred in this case.

We conclude that the district court did not err in denying the motion for bill of particulars, and instead striking the words "and other" from the indictment.

*Admission of Evidence Obtained by Arrest and Search Claimed to be Illegal.*

John Taylor Malone, the conspirator not indicted, testified as a witness for the Government. According to his testimony, on March 26, 1963 all three conspirators drove from Houston to Laredo, Malone in one automobile and Marsh and Martinez in another. Marsh stayed on the United States side of the border. Martinez walked across the International Bridge into Nuevo Laredo, Mexico. Malone drove across, met Martinez, and proceeded to the house of a Mexican national named Juan who was introduced to Malone by Martinez. Juan was described as the uncle of Martinez. Heroin was purchased from Juan and thereafter smuggled into the United States by Malone in the car. Martinez returned by foot. Other purchases were made by Malone on April 1, April 14, and April 20. On April 20, Malone was arrested when 40 grams of heroin were found secreted in the vehicle which was owned by Marsh.

On the morning of the trial the Government furnished the defendants' attorney with a memorandum as to the proposed testimony of Reese Hughes, a Constable of Duval County, Texas. The defendants requested leave to make a motion under Rule 41(e), Fed.R.Crim.P., to suppress his evidence. The Court stated: "You can make your objection to it, Mr. Woody, and I suggest probably your point will be preserved by objection at this time. I don't believe I would grant leave to file a motion to suppress at this time." Thereafter, over the defendants' objection, the testimony of the witness was admitted "for the limited purpose of showing motive, as part of the plan or scheme."

It had been established by testimony of the Customs Inspectors that on that date Martinez walked across the bridge into Mexico at 7:56 P.M. and walked back across into the United States at 10:15 P.M. Later, at some time before midnight, Hughes received a call, the sole evidence of which is given in one brief sentence of Hughes's testimony: "I received a call from the Customs agent's office here in Laredo to exercise a lookout for Mr. Martinez."

Hughes then checked traffic at the intersection of Highways 173 and 59 in Freer, Texas, which we find from an examination of the Rand McNally Road Atlas to be 63 miles distant from Laredo. At approximately midnight, Martinez drove the car in which he and Marsh were riding up to the intersection where Hughes was checking traffic. Hughes testified:

"Q. All right, sir. Did you stop these two defendants at that time?

"A. Yes, sir. I stopped the car Mr. Martinez was driving, and I asked him for his driver's license, and he identified himself with his driver's license.

"Q. And do you recognize these two defendants as the same persons?

"A. Yes, sir.

"Q. What did you do after you saw the driver's license?

"A. I asked him to get out, and told him we were going to have to hold him until the other officers—

"Q. And you held him?

"A. Yes, sir.

"Q. Did you take him into an office or a house or something?

"A. Yes, sir, we took him down to the office there in Freer.

"Q. And were their actions voluntary, or were they under arrest?

"A. They voluntarily went with me. I told them to—asked them to come with me. They went on down there to the office.

"Q. All right. Did you have any conversation with Mr. Martinez at that time? Just answer yes or no.

"A. Yes, sir.

"Q. Did Mr. Martinez say anything to you about where he was coming from before you stopped him?

"A. Yes, sir, he said he was coming from Laredo.

"Q. And did he say anything about being across the border in Nuevo Laredo?

"A. In the course of our conversation, he said he had been to Nuevo Laredo.

"Q. And did he say anything to you about any third party, any other person that was with him?

"A. No, sir.

"Q. As far as you knew, it was just these two?

"A. Yes, sir.

"Q. All right. Did he say anything to you about any of his activities in Nuevo Laredo? Shortly before you stopped him?

"A. Not right then, no, sir.

"Q. Did he at any time?

"A. Later on, after I had examined his arms, he admitted that he had been into Nuevo Laredo and got a fix.

"Q. Did you examine his arms?

"A. Yes, sir.

"Q. What did you see?

"A. I found a fresh needle mark in his elbow.

\* \* \* \* \* \*

"Q. Mr. Hughes, after the two defendants were stopped by you, about how much time elapsed between the initial stopping and the statement of Martinez about the fix, and Martinez showed you his arm? In other words, how much time went by before that occurred?

"A. Oh, I'd say within less than an hour, when they—

"Q. Were they under arrest at that time?

"A. I just told them that I—I was going to hold them until the Customs agents arrived.

"Q. You never placed them under arrest?

"A. Not at that time, no, sir.

"MR. WOODY: Your Honor, I will object to this. If he had them in custody, they were under arrest.

"THE COURT: I would rule they were under arrest. This gentleman was detaining them as an officer of the law, waiting for other law enforcement officers to get them."

When the Customs agents arrived, they in company with Hughes searched the automobile, but did not find any contraband. Martinez and Marsh were detained "the rest of the night of the 26th, and the night of the 27th, and the next morning they were released."

The theory upon which the district court admitted Hughes's testimony was well expressed by the court:

"Well, we have held frequently that the right to arrest by Customs agents doesn't cease simply because the suspect may get his foot across on this side of the bridge, that it extends to the immediate area, this vicinity, because of the practice of

arranging for deliveries of narcotics to be made on this side of the river, where they are frequently made."

■ Border searches are, of course, not exempt from the constitutional test of reasonableness.[2] A true border search, however, is not regarded as unreasonable even though made without probable cause.[3] The reasonableness of the border search and the necessity for probable cause to search those lawfully within the country are both clearly stated in Carroll v. United States, 1925, 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L. Ed. 543:

"Travelers may be so stopped in crossing an international boundary because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in. But those lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official, authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise."

■ The district court was entirely correct in stating "that the right to arrest by Customs' agents doesn't cease simply because the suspect may get his foot across on this side of the bridge, that it extends to the immediate area." In Haerr v. United States, 5 Cir., 1957, 240 F.2d 533, the checking station was located about fourteen miles from the border. However, as noted by the Ninth

Circuit in Contreras v. United States, 1961, 291 F.2d 63, 66:

"When the officers began their investigation, they noticed appellant in the back seat, *apparently attempting to hide two boxes*. When asked to pull over to the side the driver rapidly and suddenly drove the car away. The officers pursued, and noticed that the boxes in question were thrown from the car a few hundred yards from the check station. There was thus no search nor any seizure at all. The court so held."

In Ramirez v. United States, 5 Cir. 1959, 263 F.2d 385, the inspectors or customs officers had established a checking point on U.S. Highway 281 about four miles south of Fulfurrias and about 75 miles north of the Rio Grande River. However, as noted by the district court:

"In addition, I think the officers had reasonable grounds to believe that a customs offense was being committed even though the checking point was, of necessity, somewhat removed from the border. Defendants were nervous and evasive; they were reluctant to have the trunk of the automobile opened at all."

263 F.2d at 387. See also footnote 1, 263 F.2d 386, 387.[4]

■■ The right of border search is indeed broad, and the border itself is elastic.[5] Judged by Texas standards, sixty-three miles is a small distance, and if the Customs agents had any reason, even though not ordinarily measuring up to "probable cause," it might, under all of the circumstances, suffice to meet the constitutional test of reasonableness and amount to "probable cause." In this

2. See U.S.Const. amend. IV; United States v. Yee Ngee How, N.D.Calif.1952, 105 F.Supp. 517, 519, et seq.

3. Carroll v. United States, 1924, 267 U.S. 132, 154, 45 S.Ct. 280, 69 L.Ed. 543; Boyd v. United States, 1886, 116 U.S. 616, 622, 623, 6 S.Ct. 524, 29 L.Ed. 746; The Atlantic, 2 Cir. 1933, 68 F.2d 8, 10; Murgia v. United States, 9 Cir. 1960, 285 F.2d 14, 17.

4. Compare the series of Ninth Circuit cases: United States v. Yee Ngee How, N.D.Calif.1952, 105 F.Supp. 517, 520, 521; Cervantes v. United States, 9 Cir. 1960, 278 F.2d 350; Plazola v. United States, 9 Cir. 1961, 291 F.2d 56; Contreras v. United States, 9 Cir. 1961, 291 F.2d 63, 65.

5. See King v. United States, 5 Cir. 1958, 258 F.2d 754; Barrera v. United States, 5 Cir. 1960, 276 F.2d 654.

case, however, there is simply no proof as to what, if anything, the Customs agent on the border knew which caused him to telephone to Constable Hughes and ask him to arrest Martinez. There is nothing more than the Constable's bare conclusion, heretofore quoted, that "I received a call from the Customs agent's office here in Laredo to exercise a lookout for Mr. Martinez." At the same time, the record does show that the regular check point was at the bridge and there, according to the briefs, Martinez was stopped and searched. Under such circumstances, the Government's effort is to stretch the right of border search beyond the breaking point. For if the Government seeks to qualify the action as a geographically "extended" border search, it must show [6] at least the circumstances known to the officers at the border which reasonably justified the request relayed to officers in the interior. Any other doctrine would render travelers who had recently entered this country subject to almost unlimited arrest and search without any cause save the simple request of a border officer to one at an interior point. In our view this cannot be squared with the test of reasonableness under the Fourth Amendment. Bearing to a considerable extent on this question of reasonableness are the words spoken in the context of a probable cause situation in Carroll v. United States, supra. As to a traveler lawfully in the country, the Court says he is "entitled to use the public highways, have a right to free passage without interruption of search unless there is known to a competent official, authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise."

Upon the present record, we must hold that the arrest and search of Martinez were illegal and that the court erred in admitting the testimony of Constable Hughes.

We need not pass on the defendant's further argument that the court abused its discretion in admitting Hughes's testimony because its probable prejudicial effect on the jury far outweighed such relevance as it might have to the case on trial. Certainly that testimony was injurious to both defendants. The judgments are therefore reversed and the cause remanded.

Reversed and remanded.

---

6. As in situations presenting the issue of "probable cause," Brinegar v. United States, 1949, 338 U.S. 160, 174, et seq., 69 S.Ct. 1302, 93 L.Ed. 1879; Plazola v. United States, 9 Cir.1961, 291 F.2d 56, 60; Wrightson v. United States, 1955, 95 U.S.App.D.C. 390, 222 F.2d 556, the burden of establishing reasonableness is on the Government.