**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Mary Elaine Black STORM,
Defendant-Appellant.**

**No. 72-3138**

**Summary Calendar.***

United States Court of Appeals,
Fifth Circuit.

June 22, 1973.

* Rule 18, 5 Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Company of New York et al., 5 Cir., 1970, 431 F.2d 409, Part I.

Jeffrey M. Friedman, James A. Burroughs, Austin, Tex., for defendant-appellant.

Anthony J. P. Farris, U. S. Atty., James R. Gough, Asst. U. S. Atty., Houston, Tex., Dan Alfaro, Asst. U. S. Atty., Laredo, Tex., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, and DYER and SIMPSON, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Appellant launches a three phased attack on her conviction of possession with intent to distribute 643 pounds of marijuana, a violation of 21 U.S.C.A. § 841. First, she contends that the trial Judge erred in overruling her motion to suppress the fruits—or, more precisely, the weeds—of an unlawful search. Next, she contends that the trial Judge's 118 question examination of her constituted a departure from his role of detached neutrality and a violation of due process. Finally she would have us hold that the trial Judge's failure to ask each prospective juror if he or she would credit the testimony of a police officer or government agent over that of another witness merely because of the official capacity of the officer is reversible error.[1] Finding Appellant's first argument to be meritorious, we reverse without considering her other points.

### A Pastoral Interlude

When Mary Elaine Black Storm agreed to interrupt her weekend visit with a step-sister in Austin in favor of a camping jaunt with casual friend David Seis to Falcon Lake, little did she know of the calamitous consequences of that choice. She and Seis, along with the Appellant's two-year-old daughter, departed from Austin, Texas—destination Falcon Lake [2]—on the morning of March 8, 1972, in Seis's 1972 white Chevrolet pickup with attached camper. They spent that night in the camper. The following day was spent largely in piscatorial pastimes. Seis left the campsite alone in the truck for several hours.

During the night of the 9th, Appellant's daughter became ill. In the wee hours of the morning Appellant decided that she must seek medical attention for her daughter. All left the campsite together, but Seis rode only as far as a nearby Gulf Station.

Meanwhile, on March 9, 1972, Immigration Officer George P. Newman of the Hebbronville Station, United States Border Patrol, received a disturbing re-

1. See United States v. Gassaway, 5 Cir., 1972, 456 F.2d 624.

2. Falcon Lake or Reservoir is a man-made reservoir. Its waters come from the Rio Grande, thus, it is part of the international boundary between Mexico and the United States.

quest on the telephone from a person claiming to be Narcotics Agent Billy Boyd of the Texas Department of Public Safety. The phone caller requested the Border Patrol to "take the heat off" the highway at Hebbronville between 5:00 and 7:00 a. m. on the morning of March 10, 1972, for a white 1972 Chevrolet pickup with a camper. Supervisor Newman relayed the information received to the United States Customs Bureau and his subordinates, Patrolmen Jerome Ostrowski and Joe Garza. Presumably because this was a Customs matter, Newman gave no special instructions to the Border Patrolmen—they were merely instructed to go about their normal routine. The Customs Bureau, however, did not ignore it.[3] They sent Customs Agent Richard Lew to Hebbronville where he made contact with Border Patrolmen Ostrowski and Garza. He gave them a walkie-talkie to notify him when the truck was sighted.

At about 3:30 in the morning the Border Patrolmen observed Appellant driving north on Highway 16 in Seis's camper. They notified Agent Lew and proceeded to stop the vehicle. After satisfying himself that the Appellant was a United States citizen, Patrolman Ostrowski requested that she open the back of the camper so that he could search for aliens.[4] When the camper was opened, the agent detected the strong odor of marijuana tightly wrapped in cellophane bags. The rest of the story need not be recounted. Some 643 pounds of marijuana were found throughout the camper. This prosecution followed.

*Borders Of The Fourth Amendment*

The search took place at Hebbronville, Texas approximately 55 miles north of the International border. The government seeks to bring the search within the broad and liberal ambit of the term "border search". They thus seek to envelop the actions of the arresting officers here with the extensive panoply of statutorily-created, judicially-recognized powers to search without a warrant. 8 U.S.C.A. § 1357; 19 U.S.C.A. §§ 482, 1581, and many others; United States v. McDaniel, 5 Cir., 1972, 463 F.2d 129; United States v. Wright, 5 Cir., 1973, 476 F.2d 1027; United States v. Thompson, 5 Cir., 1973, 475 F.2d 1359; United States v. De Leon, 5 Cir., 1972, 462 F.2d 170; United States v. Maggard, 5 Cir., 1971, 451 F.2d 502; United States v. Bird, 5 Cir., 1972, 456 F.2d 1023; United States v. Hill, 5 Cir., 1970, 430 F.2d 129; United States v. Arroyave, 5 Cir., 1973, 477 F.2d 157 [1973]. But a badge and a hat are not impregnable talismans merely because of the elasticity of our Nations' perimeter.[5]

---

3. For a discussion of the relationship and distinctions between the powers and duties of United States Customs Officers and United States Immigration Officers see United States v. Thompson, 5 Cir., 1973, 475 F.2d 1359 [1973]. See also United States v. McDaniel, 5 Cir., 1972, 463 F.2d 129.

4. There is some conflict in the government's case at this point. Patrolman Ostrowski steadfastly maintained that the stop was a routine one made to locate unauthorized aliens. He specifically denied that the information he had received from his supervisor Patrolman Newman or the contact that he had had with Customs Agent Lew had anything to do with his decision to stop the vehicle. Agent Lew, on the other hand, testified that the stopping of the white camper was made because of the curious and suspicious information that Patrolman Newman had received over the telephone.

5. By administrative declaration, the Immigration Officer's statutory power to search without a warrant extends to all points within 100 air miles from an external boundary of the United States. 8 C.F.R. § 287.1(a)(2). United States v. Thompson, *supra*. But this does not totally free searches within such perimeter from exacting scrutiny. See United States v. Garcia, 5 Cir., 1971, 452 F.2d 419 (35 mile inland search upheld on basis of informant's tip and constant surveillance by government agents); United States v. Reagor, 5 Cir., 1971, 441 F.2d 252 (registered drug addict stopped 60 miles inland at first town after being observed crossing border); Walker v. United States, 5 Cir., 1969,

■ ■ Ordinarily border searches are conducted at, or very near, the border. "The statutory authority under which border searches are conducted designates a border *crossing* * * * as the event giving rise to the authority to conduct a border search." United States v. Cristancho-Puerto, 5 Cir., 1973, 475 F.2d 1025 (Simpson, J., Dissenting from the denial of rehearing en banc). When a person or vehicle is detained at the border just after entering the Country, the agent's statutory authority to search is virtually unfettered except perhaps as to due process concerning the manner, not the cause, of the search. E. g., Lane v. United States, 5 Cir., 1963, 321 F.2d 573; Blackford v. United States, 9 Cir., 1957, 247 F.2d 745; King v. United States, 5 Cir., 1958, 258 F.2d 754. Presumably, they are limited only by common standards of decency and propriety. But with respect to situations which will not justify an extended border search, "those lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search." Carroll v. United States, 1925, 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543, 552.

■ Of course the vehicle or person to be searched does not have to have crossed the border himself if there are sufficient facts known to the arresting officers and disclosed on the record to indicate that they have been in contact with people or things known to have crossed the border. United States v. Hill, *supra*; United States v. Garza, 5 Cir., 1973, 474 F.2d 1345.

■ Where there is no indication or record basis for believing that the vehicle has recently crossed the border or

been in contact with those who have, however, mere proximity to it will not suffice. The circumstances surrounding the search must give rise to a "reasonable suspicion" that an offense has been committed or that a forbidden person or substance is hidden. *McDaniel, supra*; Morales v. United States, 5 Cir., 1967, 378 F.2d 187, 189.

In Marsh v. United States, 5 Cir., 1965, 344 F.2d 317, we invalidated a search by a Texas constable which occurred 63 miles from the border. Acting upon information received from a United States Customs Agent to be on the lookout for a certain vehicle, a Texas constable stopped the Defendant's car when it came within his jurisdiction. The Court recognized the very extensive authority of Customs and Immigration officers to search and the elasticity of the border for such purposes, but held nonetheless that the search following this stop had to be judged on the basis of a reasonable assessment of the totality of circumstances. Because the arresting officer had no knowledge other than the fact that he had been requested to be on the lookout and the fact that the record failed to reveal the reason which justified the notifying officer's suspicions, the Court held that the search failed to fit within the aegis of the "border search" exception to the Fourth Amendment's warrant requirement.

The government would have us distinguish *Marsh* on the basis of the status of the arresting officer. Thus, they contend that the Texas constable in *Marsh* could only arrest and search with probable cause. But the government argues that federal officers possess stat-

---

404 F.2d 900 (defendant who was searched once at border was subject to second search 45 miles inland on basis of confidential tip and government surveillance); Ramirez v. United States, 5 Cir., 1959, 263 F.2d 385 (defendants stopped at regular check point 75 miles inland were extremely nervous and evasive). *Cf.* Smith v. United States, 5 Cir., 1967, 385 F.2d 34 (search occurring 175 miles from border justified by find-

ing of probable cause). We do not mean to intimate that the officers do not possess the authority to make a warrantless search within the prescribed limits. We only hold that there must be a record showing that the vehicle or its passengers have recently crossed the border or been in touch with those who have if a warrantless search is to be justified as a "border search".

utory authority to search on the basis of a reasonable suspicion. Without determining the matter or even intimating our views as to the merits of this distinction we recognize that our Brothers of the Second Circuit have held that "A customs officer's unique power to conduct a 'border search' is coextensive with the limits of our international border areas, and a search and seizure within these areas by a customs officer, reasonable enough under these circumstances, could perhaps be challenged as violative of the Fourth Amendment if conducted by different officials elsewhere." United States v. Glaziou, 2 Cir., 1968, 402 F.2d 8, 12. But this ignores the clear holding of *Marsh.* The search was not invalidated there because it was conducted by a state rather than a federal officer. It was invalidated because the record did not detail sufficient facts known or made known to the arresting officer to support a reasonable suspicion that the vehicle had crossed the border, been in contact with those who had, or contained unauthorized aliens or contraband. Indeed, we have no doubt that a search by a state official acting upon the well-founded direction of federal officers or a combination of them could come within the limits of a border search.

▌ Juxtaposing *Marsh* with the case at bar we have the following comparison. In *Marsh,* a 63 mile inland search by a state officer acting on the affirmative direction of Customs officials was invalidated. Here, a 55 mile inland search was conducted by federal officials in spite of—rather than at the request of—the plea by state law enforcement officials to "take the heat off". The total absence of any record fact, supported or unsupported, which would justifiably arouse the officers' suspicions compels us to apply *Marsh,* and reverse. Our holding is in no way a denigration of the officers' statutory powers. We merely hold that the record must clearly reveal the circumstances which support the decision to search. This record does not.

Reversed.