UNITED STATES of America

v.

Harvey Gene LOVE.

Crim. No. 75–H–221.

United States District Court,
S. D. Texas,
Houston Division.

April 15, 1976.

Scott L. Campbell, Asst. U. S. Atty., Houston, Tex., for plaintiff.

Charles Szekely, Asst. Public Defender, Houston, Tex., for defendant.

## MEMORANDUM OPINION

SINGLETON, District Judge.

Defendant was charged with the unlawful possession of counterfeit obligations of the United States, in violation of 18 U.S.C. § 472.[1]  To this charge defendant pleaded

---

1.  The exact wording of 18 U.S.C. § 472 is as follows:

   "Whoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, or with like intent brings into the United States or keeps in possession or conceals any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined not more than $5,000 or imprisoned not more than fifteen years, or both."

not guilty. Thereafter, having properly executed a waiver of a trial by jury defendant was tried by this court on January 14, 1976. By the totality of the evidence presented at trial, having denied defendant's motion to suppress, the court found beyond a reasonable doubt that the defendant did have the requisite intent to defraud and that he did have in his possession at the relevant time counterfeited obligations of the United States. Therefore, defendant was found guilty as charged.

At trial the Government called two witnesses, Tony R. Martinez, a United States Customs inspector, and Mack Dennis Hartsell, Jr., a special agent of the United States Secret Service. In addition, crucial to this court's determination of defendant's guilt was the admission into evidence of fifteen $20 counterfeited federal reserve notes found in the possession of defendant. Defendant did stipulate on the record that the notes were counterfeited and that defendant knew that such notes were counterfeited. However, defendant made a motion to suppress the introduction of the notes themselves into evidence as well as any statements made by defendant after his being searched and the notes seized including those statements made during and after the time of arrest. The court deemed it proper to carry defendant's motion along with the trial, that is, admitting the relevant evidence subject to defendant's motion to suppress. Depending solely upon his motion, defendant called no witnesses.

Having viewed the entire evidence, this court finds that the facts are quite uncomplicated. That is, on March 28, 1975, at approximately 4:30 p. m., Harvey Gene Love arrived at Houston International Airport aboard a Braniff airliner after a flight originating in Mexico City. Arriving in Houston on board an aircraft that had made no other stop since crossing into the United States from Mexico, Love was subjected to a customs search. The sole basis for the search was extremely detailed information which the searching Customs inspector had received from his supervisor. The Customs inspector made no independent observations of any conduct by defendant before he was searched that was out of the ordinary.

The search of Love took place in two segments. First, there was a purely luggage search in the outer Customs area. Second, not having found certain contraband that the Customs inspector was advised was in the possession of Love, the Customs inspector carried out a search, in a private search room, of the garments which Love was wearing. Nothing was found in the defendant's outer garments. However, after Love had fully undressed, the inspector discovered fifteen counterfeit United States $20 bills in a plastic pouch concealed in the crotch of defendant's underpants. At that point, defendant was placed under arrest and shortly thereafter turned over to the custody of Secret Service agents.

This court must agree with the assessment of defendant's attorney that the Government's entire case would stand or fall on whether or not defendant's motion to suppress would be granted. The primary thrust of defendant's arguments is that he was subjected to an illegal search and seizure in violation of his fourth amendment rights. As stated above, this court has found that defendant's motion was without substance and necessarily has thereby found that there was no illegal search and seizure.

■ The right to be free from illegal searches and seizures is a right emanating directly from the fourth amendment of the United States Constitution. However, not all searches and seizures are denounced, only those that are "unreasonable." *Carroll v. United States,* 267 U.S. 132, 147, 45 S.Ct. 280, 283, 69 L.Ed. 543, 548–49 (1925). And further, that which might be considered as unreasonable in one setting is not unreasonable in another setting.

The setting in this case which influences the mode of analysis is that the search here was a "border search." A second pertinent fact is that by requiring defendant to disrobe, the Customs agent in charge was conducting what has been characterized as a "strip search." *United States v. Carter,* 480

F.2d 981 (9th Cir. 1973); *see United States v. Price,* 472 F.2d 573 (9th Cir. 1973); *Henderson v. United States,* 390 F.2d 805, 808 (9th Cir. 1967).

■ With regard to a characterization of the search in this instance as being a "border search," the facts here exactly fit one example given by Justice Stewart to describe what constitutes a "functional equivalent[s] of a border search."[2] *Almeida-Sanchez v. United States,* 413 U.S. 266, 273, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596, 602 (1973). Of course the relevance of the search in this case being a "border search" is that where such a search is conducted under proper authority, it is not necessary that there be a warrant or "probable cause" to conduct such a search. *United States v. Bowman,* 502 F.2d 1215, 1219 (5th Cir. 1974). As has been stated in *United States v. McDaniel,*

> In substance, the term "border search" is merely a short-hand method of stating that a search is, under the circumstances, a "reasonable" stretch of the usual Fourth Amendment standard of "probable cause" because of the proximity of an international frontier and other attendant factors.

463 F.2d 129, 132 (5th Cir. 1972), *cert. denied,* 413 U.S. 919, 93 S.Ct. 3046, 37 L.Ed.2d 1041 (1973).

Of course the reason that some lesser standard than probable cause is acceptable in this context is that there is a traditional and widely accepted right for a nation to examine both goods and people entering its borders. *King v. United States,* 517 F.2d 350, 352 (5th Cir. 1975). This traditional right of the sovereign is related to the logical conclusion that there is a possibility that a person crossing an international boundary might be attempting to enter illegally or else might be attempting to bring contraband into the country. Given the volume of traffic entering a country, "border searches" are justified as a measure of national self-protection. *Carroll, supra* 267 U.S. at 154, 45 S.Ct. at 285, 69 L.Ed. at 551–52; *McDaniel, supra* at 132.

As noted before, some standard not rising to the level of probable cause is necessary to justify a search by a person with statutory authority to conduct a search at a border or its equivalent. However, there appears to be a great deal of uncertainty as to the exact rule to be applied. There are several complicating factors.

The first problem is to determine the precise authority under which the person conducting the relevant search is operating. This issue can be clouded by the fact that apparently Border Patrol agents can wear two hats, that is, they can act as either Customs agents or Border Patrol agents depending on the particular situation. *United States v. Thompson,* 475 F.2d 1359 (5th Cir. 1973), *McDaniel, supra* at 134. However, in this instance clearly the Customs agent who searched the defendant was operating under the authority of 19 U.S. § 482.[3] In relevant part, § 482 would give this Customs agent the authority to "stop, search, and examine any vehicle,

---

**2.** The precise example given by Justice Stewart was that "a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City would clearly be the functional equivalent of a border search."

**3.** "Any of the officers or persons authorized to board or search vessels may stop, search, and examine, as well without as within their respective districts, any vehicle, beast, or person, on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law, whether by the person in possession or charge, or by, in, or upon such vehicle or beast, or otherwise, and to search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law; and if any such officer or other person so authorized shall find any merchandise on or about any such vehicle, beast, or person, or in any such trunk or envelope, which he shall have reasonable cause to believe is subject to duty, or to have been unlawfully introduced into the United States, whether by the person in possession or charge, or by, in, or upon such vehicle, beast, or otherwise, he shall seize and secure the same for trial."

19 U.S.C.A. § 482.

beast, or person, on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law."

A second problem, indeed the most crucial inquiry, is the degree of suspicion which is "reasonable" under a given set of circumstances to justify a search. With regard to the standard to be applied, the language of § 482 is itself ambiguous. In that portion of the statute which specifically deals with searches, the term used is "suspect." Thus taken literally, a person can be searched if there is mere suspicion by a Customs agent that such person is carrying something unlawfully imported into the United States. On the other hand, that part of § 482 which deals with seizures authorizes Customs agents to seize any merchandise which they " 'shall have reasonable cause to suspect [believe] . . . to have been unlawfully introduced into the United States.' " *Thomas v. United States,* 372 F.2d 252, 254 (5th Cir. 1967).

However, judicial decisions in the Fifth Circuit have restated the applicable standard in terms of "reasonable suspicion," [4] or else in terms of "unfettered discretion." *United States v. Storm,* 480 F.2d 701 (5th Cir. 1973). Several decisions have sought to reconcile the differences in terminology on the basis of the location of the search. It is stated in these decisions that when a search occurs at the border itself, then the search can be made with almost total impunity by an authorized government agent, i. e. that there is a virtually "unfettered discretion" to search.[5] *United States v. Soria,* 519 F.2d 1060, 1063 (5th Cir. 1975); *United States v. Bowman,* 502 F.2d 1215, 1218–1219 (5th Cir. 1974). In contrast, with regard to searches conducted away from the border, the court in *Soria* asserted that before *Almeida-Sanchez, supra,* the Fifth Circuit "consistently imposed a reasonable suspicion requirement at points beyond the border itself." 519 F.2d at 1062. However, it is certain that not all the decisions of the Fifth Circuit can be reconciled purely in terms of geographical proximity to the border.[6]

The key question at this stage is whether in this case the test to be applied should be "reasonable suspicion," "unfettered discretion," "mere suspicion," or some other equally elusive term.

In formulating the proper test, another element must be considered in addition to the place of the search and the authority of the person doing the searching. That element is the nature of the search. This relates to the fact that any search is an intrusion to one degree or another on an individual's right of privacy. However, it can hardly be said that searching one's car or looking in one's overcoat or requiring one to open one's luggage or requesting that one take off his clothes so that they can be searched or the physical intrusion of actually probing into one's body cavities results in

---

4. *See, e. g., United States v. Estrada,* 526 F.2d 357 (5th Cir. 1976); *United States v. Thompson,* 475 F.2d 1359 (5th Cir. 1973); *United States v. McDaniel,* 463 F.2d 129 (5th Cir. 1972), *cert. denied,* 413 U.S. 919, 93 S.Ct. 3046, 37 L.Ed.2d 1041 (1973); *United States v. Maggard,* 451 F.2d 502 (5th Cir. 1971); *Morales v. United States,* 378 F.2d 187 (5th Cir. 1967).

5. It must be noted, however, that at least in two cases where searches occurred at the actual border it was concluded that the relevant test, to determine whether the searches were permissible, was the existence of "reasonable suspicion" at the time of the search. In *United States v. Bates,* 526 F.2d 966 (5th Cir. 1976), the court ruled permissible the search of a car at an international bridge between the United States and Mexico. And in *United States v. Chiarito,* 507 F.2d 1098 (5th Cir. 1975), which

was cited in *Bates,* the court found permissible the search of a person arriving at an American international airport from another country.

6. The point is made in various cases that even where a search does not happen at the actual border, the discretion given to an authorized government agent ought to be as broad as at the border itself. The key factor is not merely proximity to the border, but whether there is some reasonable connection between the person or vehicle to be searched and the border. That is, is there some basis for belief that the vehicle or person has just crossed the border or that there has been some direct contact with a person or vehicle recently crossing the border. *United States v. Bowman,* 502 F.2d 1215, 1219 (5th Cir. 1974); *United States v. Storm,* 480 F.2d 701, 704 (5th Cir. 1973).

the same amount of intrusion. In common-sense terms, it is logical to assume that the greater the intrusion, the greater must be the reason for conducting a search that results in such invasion. *See Almeida-Sanchez v. United States,* 413 U.S. 266, 279, 93 S.Ct. 2535, 2542–43, 37 L.Ed.2d 596, 606 (1973) (concurring opinion).

Defendant forcefully argued in this case that the search conducted was of such a nature that it could only be justified if it were found that at the time of the search, the Customs agent who made the search decision had "real suspicion" directed at Love, the defendant.

The term "real suspicion" is a term of art developed by the Ninth Circuit merely as a shorthand method of articulating a resolution of the competing interests when a so-called "strip search" is conducted at a border point. *See, e. g., United States v. Mastberg,* 503 F.2d 465 (9th Cir. 1974); *United States v. Guadalupe-Garza,* 421 F.2d 876 (9th Cir. 1970); *Henderson v. United States,* 390 F.2d 805 (9th Cir. 1967). In the most elemental terms, there is a public interest clashing with an individual interest. *See Carroll v. United States, supra* 267 U.S. at 149, 45 S.Ct. at 283–84, 69 L.Ed. at 549–50. There is a strong public interest in preventing smuggling of merchandise, to escape paying duties, the possession of which is not by itself illegal, and preventing the smuggling of those items, in the modern context most usually illegal drugs, possession of which is illegal and which ultimately and

often tragically injure the public at large. Also there is the situation here, that is, the smuggling of counterfeit notes the economic burden of which will ultimately be borne by the general public if they are successfully negotiated. Another consideration is the impossibility of adequately guarding our frontiers if all searchers were to be held to such a standard as the existence of "probable cause." Of course, the competing interest is that of the individual's privacy as protected by the fourth amendment.

The standard which defendant would have this court apply, that of "real suspicion, directed specifically to that person" has been defined in the following manner:

"Real suspicion" justifying the initiation of a strip search is subjective suspicion supported by objective, articulable facts that would reasonably lead an experienced, prudent customs official to suspect that a particular person seeking to cross our border is concealing something on his body for the purpose of transporting it into the United States contrary to law.

The objective, articulable facts must bear some reasonable relationship to suspicion that something is concealed on the body of the person to be searched; otherwise, the scope of the search is not related to the justification for its initiation, as it must be to meet the reasonableness standard of the Fourth Amendment.[7]

*United States v. Guadalupe-Garza, supra,* at 879.

---

7. The "articulable facts" doctrine clearly was conceived to insure that persons who otherwise had authority to search would not engage in highly personal searches based purely on speculation, hunches, at random, or for some other indefinable reason. However, the theory of articulable facts is really aimed at physical manifestations or observed behavior; for example, "he was nervous," "she had shifty eyes," "they had needle marks on their arms," "X had on two overcoats in the middle of July, had red eyes, seemed listless, had no luggage, and yet had a round trip ticket to London." These are the types of things supporting the "subjective suspicion" described in *Guadalupe-Garza,* 421 F.2d 876, 879 (9th Cir. 1970), which are most amenable to an "articulable facts" approach. In the case here, however, it would

have no analytical probative value to say that the articulable facts are from the viewpoint of Inspector Martinez, "My supervisor told me such and such and I believed him." More meaningful in terms of the policies underlying the "articulable facts" concept is the uncontroverted fact that the inspector was at the threshold alerted and made suspicious by his information and then as each element of information was verified, his suspicion reasonably mounted. This was certainly sufficient by the time the actual search was made to "lead an experienced, prudent customs official to suspect that a particular person seeking to cross our border is concealing something on his body for the purpose of transporting it into the United States contrary to law." *United States v. Guadalupe-Garza, supra* at 879.

In attempting to persuade this court to adopt a test of "real suspicion," defendant presented a case from the Ninth Circuit, *United States v. Williams,* 459 F.2d 44 (9th Cir. 1972), which he believes should be conclusive in his favor. In that case, the defendant was entering the United States as a passenger in a car belonging to the driver. Computer information revealed to a customs inspector that there was reason to be suspicious of the vehicle. After making further inquiry through the computer, the inspector determined that the occupants were suspected of having smuggled contraband into the United States. Further, the inspector ascertained that the information originated from a long-time reliable narcotics agent. On the basis of this information, a strip search was conducted and drugs were found hidden in the defendant's crotch beneath his underpants.

The Ninth Circuit found the search to have been illegal. This court is not persuaded, however, that what was found to be unreasonable in *Williams* is directly applicable here. In *Williams,* the initial focus of suspicion was on the vehicle and not on the individual. Such is not the case here.[8] Although the focus of suspicion sharpened eventually in *Williams,* the nature of the suspicion was general, i. e. there was suspicion that "contraband" had been brought into the country. There was no hint as to what the contraband might be specifically. In the case before this court, the information very specifically described "counterfeit money" as being in the possession of the defendant. Finally, and perhaps most critical in terms of the search actually conducted, the inspector had no inkling where such contraband, if any, might be hidden. Apparently, there was not even so much as a preliminary search of the vehicle in which defendant was a passenger. The importance of this aspect of the case is made clear by the following passage citing *Guadalupe-Garza, supra:*

> The existence of the necessary "real suspicion" depends, in turn, upon a showing

of "objective, articulable facts that would reasonably lead an experienced, prudent customs official to suspect that [contraband] . . . is *concealed on the* body of the person to be searched . . . ." *United States v. Guadalupe-Garza,* 421 F.2d 876, 879 (9th Cir. 1970) (emphasis supplied in *Williams* ).

*Williams,* 459 F.2d at 46. Certainly, in *Williams* there was nothing to specifically believe that the contraband was "concealed on the body of the person to be searched." In contrast, in this case the information received by Martinez was specifically that Love had counterfeit money "either on his person or in his baggage, in his clothing, probably his underwear."

It should be noted that the Fifth Circuit, and this court believes this to be fortunate, has not been caught up with using a particular magic phrase to describe when the search of a person at the border is constitutionally reasonable. Whether a person is caused to disrobe, or whether a fluoroscope examination is conducted, or whether there is some other invasion of privacy, the facts of each case prescribe whether at the threshold such an invasion by means of a search was constitutionally permissible. *See, e. g., United States v. Wilson,* 488 F.2d 400 (5th Cir. 1973); *United States v. Forbicetta,* 484 F.2d 645 (5th Cir. 1973); *United States v. Briones,* 423 F.2d 742 (5th Cir. 1970), *cert. denied,* 399 U.S. 933, 90 S.Ct. 2270, 26 L.Ed.2d 804 (1970); *Lane v. United States,* 321 F.2d 573 (5th Cir. 1963); *King v. United States,* 258 F.2d 754 (5th Cir. 1958), *cert. denied,* 359 U.S. 939, 79 S.Ct. 652, 3 L.Ed.2d 639 (1959).

■ In both *Wilson, supra,* and *Forbicetta, supra,* searches conducted at an airport port of entry were sustained. Although the circumstances are different from the case at hand, in *Forbicetta* the extent of the search involved approximates the one here. The point, however, is that each search is somewhat different and must be considered in that light, rather than attempting to fit

---

**8.** *See* text on page 16 for the information that Inspector Martinez testified he received relating directly to the defendant. *See also* note 11, *infra.*

the circumstances to a somewhat indefinite expression such as "real suspicion."

Obviously, such expressions as "unfettered discretion," "mere suspicion," "reasonable suspicion," "real suspicion," and "probable cause," are merely points on an ascending master scale to be labeled "reasonableness." They are merely attempts to more precisely express degrees of reasonableness which is in fact the ultimate constitutional test to measure the permissibility of a search and seizure. *See United States v. Soria,* 519 F.2d 1060, 1062 (5th Cir. 1975); *United States v. Bowman,* 502 F.2d 1215, 1218 (5th Cir. 1974). In this court's candid view, such expressions impose upon a court the necessity to engage in semantic gymnastics. The only precision possible is to say that each expression denotes a measure of reasonableness greater than the previous one. And perhaps that is all that can be expected.

■ Fortunately, this court has concluded that in the present case, given the total circumstances, the search engaged in was eminently reasonable and that any test to be applied, almost to the extent of the existence of probable cause can be met.[9]

In capsule form, the situation as analyzed by this court is as follows: A Customs inspector serving at an airport, the functional equivalent of the border, is given specific information by his supervisor concerning an incoming passenger on an international flight. The information is corroborated in every respect except that no contraband is found in his luggage, his pockets, or his billfold. The person suspected is then taken to a private area where he disrobes. At that point contraband is found secreted in the defendant's underwear. The contraband is seized.

First, of what import is the fact that this is a search and seizure being conducted at a functional equivalent of the border? Considering the exhaustive analysis above, and considering all other factors as neutral, a Customs officer who conducts a search at such place has greater reason to be suspicious than at some point more removed by time and circumstances from a place of entry into the country. Further, it is clear that at the border itself the policies which justify a search by the sovereign are at their strongest and are not attenuated by distance which is itself a function of reasonableness.

Yet as this court strongly emphasizes, even a "border search" is subject to the constitutional test of reasonableness. *United States v. Soria,* 519 F.2d 1060, 1062 (5th Cir. 1975). In this case, the reasonableness of the search almost exclusively depends on whether the inspector who actually conducted the search could rely on information from his supervisor. In other words, could the suspicion of the inspector have been aroused sufficiently solely on the basis of the information received to reasonably justify the search actually carried out.

The information received by Customs Inspector Martinez is as follows (Tr:12, lines 9–17):

THE SUPERVISOR INSPECTOR ON DUTY AT THAT TIME TOLD ME THAT HE HAD RECEIVED A CALL FROM THE SECRET SERVICE ASKING TO LOOK OUT FOR A HARVEY GENE LOVE, WHO WOULD BE ARRIVING ON FLIGHT 502, PAN AMERICAN AIRWAYS FLIGHT 502, AND THAT HIS DESCRIPTION WAS AGE 40 TO 42, APPROXIMATELY 6'2" WEARING A REDDISH COAT AND BLACK TIE, AND THAT HE WOULD BE CARRYING COUNTERFEIT MONEY EITHER ON HIS PERSON OR IN HIS BAGGAGE, IN HIS CLOTHING, PROBABLY HIS UNDERWEAR.[10]

■ The testimony of Martinez relating what had been told him by his supervisor was not objected to, nor was the truthfulness of the information ever assailed. There is also no controversy in this case as

---

**9.** *See Carroll v. United States,* 267 U.S. 132, 161–162, 45 S.Ct. 280, 288, 69 L.Ed. 543, 554–55 (1925), for an authoritative discussion of probable cause.

**10.** The inspector later acknowledged that the information given him had referred to a specific Braniff flight rather than to a Pan American flight.

to the source of the information. Defendant's only complaint apparently is that the Government should have been put to the burden of actually producing the supervisor who was the immediate source of the information. This court disagrees with such a contention.[11]

In arguing that the search was not reasonable in this case, defendant places great reliance on the case of *Marsh v. United States,* 344 F.2d 317 (5th Cir. 1965). Defendant's reliance is misplaced. In *Marsh,* the search was found to be unreasonable because the information relied on was of such insubstantial nature. *Marsh, supra* at 325. In addition, although a search was eventually conducted by Customs agents, the most repugnant feature to the *Marsh* court was that the defendant was arrested and held, pending arrival by Customs agents, by a constable far removed from the border on very flimsy information.[12] Such conduct was in no way reasonable.

In this case, in contrast, the information received was highly detailed and definite as to who, where, when, and what was suspected. *See Stassi v. United States,* 410 F.2d 946, 949–952 & n. 3 (5th Cir. 1969), *vacated and remanded on other grounds sub nom. Giordano v. United States,* 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969). And in fact, every important detail of information was eventually corroborated. Undoubtedly, as each minute detail of information was verified, it made it that much more likely that the next bit of information was also accurate. Therefore, whatever the initial level of the suspicion by the inspector might have been, as he proceeded his suspicions were justifiably enhanced. The case of *Draper v. United States,* 358 U.S. 307, 312–313, 79 S.Ct. 329, 332–33, 3 L.Ed.2d 327, 331–32 (1959), arising in the context of probable cause which is a higher standard than that required here, provides a very useful analogy:

> Nor can we agree with petitioner's second contention that Marsh's information was insufficient to show probable cause and reasonable grounds to believe that petitioner had violated or was violating the narcotic laws and to justify his arrest without a warrant. The information given to narcotic agent Marsh by "special employee" Hereford may have been hearsay to Marsh, but coming from one employed for that purpose and whose information had always been found accurate and reliable, it is clear that Marsh would have been derelict in his duties had he not pursued it. And when, in pursuing that information, he saw a man, having the exact physical attributes and wearing the precise clothing and carrying the tan zipper bag that Hereford had described, alight from one of the very trains from the very place stated by Hereford and start to walk at a "fast" pace toward the station exit, Marsh had personally verified every facet of the information given him by Hereford except whether petitioner had accomplished his mission and had the three ounces of heroin on his person or in his bag. And surely, with every other bit of Hereford's information being thus personally verified, Marsh had "reasonable grounds" to believe that the remaining unverified bit of Hereford's information—that Draper would have the heroin with him—was likewise true.

**11.** Although directed toward a finding of probable cause to search, for a useful discussion see *Brinegar v. United States,* 338 U.S. 160, 172–173, 69 S.Ct. 1302, 1309, 93 L.Ed. 1879, 1888–89 (1949).

**12.** This position is conclusively supported by the case of *United States v. Storm,* 480 F.2d 701 (5th Cir. 1973), here cited in relevant part: "But this ignores the clear holding of *Marsh.* The search was not invalidated there because it was conducted by a state rather than a federal officer. It was invalidated because

> the record did not detail sufficient facts known or made known to the arresting officer to support a reasonable suspicion that the vehicle had crossed the border, been in contact with those who had, or contained unauthorized aliens or contraband. Indeed, we have no doubt that a search by a state official acting upon the well-founded direction of federal officers or a combination of them could come within the limits of a border search."
> 480 F.2d at 705.

To loosely paraphrase *Draper,* having personally verified every bit of information received from his supervisor, Martinez had "reasonable grounds" to believe that the remaining bit of information—that Love would have the counterfeit money with him—was likewise true. And the fact that the information stated that he would be carrying twenty to thirty thousand dollars is not persuasive to this court that the Customs inspector should have ceased his search. Repeatedly, Martinez testified that he had no idea of the denomination of the counterfeit notes and so there is no real question of physical impossibility of concealment.

■ Unquestionably, by the manner in which the information was verified, the information was reliable. However, defendant attacks the reliability of the person who relayed the information, that is, the inspector's supervisor. The court does not feel this is a substantial objection. *See Stassi, supra* at 951–952. This is not a situation where there is an informant or some other person of dubious character. In practical terms, surely a Customs agent has reason to believe and rely on the information relayed to him by an immediate superior acting in his official capacity. However, it is true that there is the possibility that a person might act out of spitefulness and disseminate untrue information. But there is generally an inference that a person will perform his official duties without abuse of his powers. And again, the very specificity and definiteness of the information and the

subsequent verification of such information must be considered not only to substantiate the reliability of the information given, but the reliability of the very person relating the information or the person originating the information.[13]

■ In summary, the various tests applied in determining the permissibility of a particular search are all related to protecting the privacy of individuals from intrusion to the greatest degree possible. To reiterate, in constitutional terms, "[t]he 4th Amendment does not denounce all searches or seizures, but only such as are unreasonable." *Carroll v. United States,* 267 U.S. 132, 147, 45 S.Ct. 280, 283, 69 L.Ed. 543, 549 (1925). Further, "[t]he 4th Amendment is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted, and in a manner which will conserve public interests as well as the interests and rights of individual citizens." *Carroll, supra* at 149, 45 S.Ct. at 284, 69 L.Ed. at 549.

■ In conclusion, this court has balanced the relevant interests and has decided that given the total circumstances, the Customs inspector in this case reasonably relied on the information given to him and that such information ultimately resulted in a level of suspicion which made his search of the defendant constitutionally reasonable and therefore permissible.[14] And the seizure of the fruits of the search was also constitutionally reasonable. Having come to such a conclusion, this court has denied

---

13. In this case a person employed by the United States Secret Service was asserted to be the originator of the relevant information. (TR:12, line 10.)

14. Generally, the term "search and seizure" is viewed as requiring only a unitary analysis. In constitutional terms this is acceptable because both searches and seizures pursuant to a search must fall within the constitutional limits of "reasonableness." However, in terms of statutory authority, 19 U.S.C. § 482 describes the standard for a search in somewhat different terms than it does a seizure. *See* note 3, *supra,* and discussion in text on page 7.
However, it must be noted that this court applied a stringent standard in its analysis regard-

ing the validity of the relevant search. And given the fact that the pertinent events occurred at a functional equivalent of the border, perhaps this court is stating the obvious. *See United States v. Forbicetta,* 484 F.2d 645 (5th Cir. 1973), a case very similar to this one, in which the court found it necessary only to determine that there had been a valid search. But, this court does specifically find that once the notes were discovered, the Customs inspector had "reasonable cause to believe" the counterfeit notes "to have been unlawfully introduced into the United States." 19 U.S.C. § 482. *See United States v. McDaniel,* 463 F.2d 129, 134 (5th Cir. 1972), for a similar analysis in the context of a search and seizure not at the border itself.

defendant's motion to suppress from evidence the counterfeit notes seized.[15]

---

**15.** In his motion, defendant also sought to suppress any statements made after he was searched and the counterfeit money was seized, including statements made during and after the time of his arrest. This part of defendant's motion is also denied, since given this court's conclusions there is no problem of possible "fruit of the poisonous tree." This court has found that the defendant was properly advised of his constitutional rights by Agent Hartsell. But having determined that the search and seizure in this case are constitutionally permissible, this court need not consider whether time, circumstances, and the subsequent giving of *Miranda* warnings would be sufficient to attenuate the taint created had the relevant search and seizure not been valid. *See Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).